FRANK E. CASWELL *vs.* LICENSING COMMISSION
FOR BROCKTON.

Plymouth. September 13, 1982. — January 11, 1983.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & LYNCH, JJ.

*Constitutional Law,* Freedom of speech, Right to assemble. *Due Process of Law,* Vagueness of statute. *License. Public Entertainment. Administrative Law,* Judicial review. *Video Games.*

The record in a civil action seeking review of a local licensing authority's denial of the plaintiff's application for licenses for coin-operated video games was insufficient to establish that the games in question were a form of expression protected under the First Amendment to the United States Constitution or art. 16 of the Massachusetts Declaration of Rights, as amended by art. 77 of the Amendments. [867-871]

Gathering in an amusement arcade for the purpose of playing video games is not encompassed within the constitutionally protected freedom of association. [871-872]

General Laws c. 140, § 177A, providing for the licensing of certain amusement devices and interpreted by this court as precluding arbitrary or capricious action by local licensing authorities, was not unconstitutionally vague as applied in a case in which the record failed to show that the video games in question contained protected expression. [873-875]

It was necessary for a municipal licensing commission to reconsider its decision denying licenses for video game machines under G. L. c. 140, § 177A, and, if it were to deny the licenses again, to give a statement of reasons for its decision, where the chairman of the commission had indicated that enhancement of the community was a factor to be considered in making a decision and where on the record before it this court could not determine to what extent this erroneous standard had been a factor in the commission's decision. [875-877]

In an action seeking judicial review of a local licensing authority's denial of an initial application for a license under G. L. c. 140, § 177A, where First Amendment rights are not involved, the standard of review is limited to examining whether the local licensing authority acted arbitrarily or capriciously, abused its discretion, or made an error of law. [877-878]

CIVIL ACTION commenced in the Superior Court Department on August 7, 1981.

The case was heard by *Wagner, J.,* on motions for summary judgment.

The Supreme Judicial Court granted a request for direct appellate review.

*Valerie L. Pawson (Ira H. Zaleznik* with her) for the plaintiff.

*Mark G. Cerel* for Licensing Commission for Brockton.

*Francis X. Bellotti,* Attorney General, *& Scott A. Smith,* Assistant Attorney General, for the Attorney General, amicus curiae, submitted a brief.

*David W. Maher & James A. Klenk,* for Amusement Game Manufacturers Association, amicus curiae, submitted a brief.

HENNESSEY, C.J.  The plaintiff, Frank E. Caswell, commenced an action for declaratory relief and for relief in the nature of certiorari against the defendant, the licensing commission for the city of Brockton (commission). Caswell's complaint sought review of the commission's denial, under G. L. c. 140, § 177A,[1] of Caswell's application for licenses for seventy-five coin-operated electronic amusement games, commonly known as video games.  After a hearing, a Superior Court judge denied a motion by Caswell for summary judgment and granted the commission's motion for summary judgment.  Judgment was entered, without opinion, dismissing Caswell's complaint.  Caswell then filed his appeal.

---

[1] General Laws c. 140, § 177A, as amended through St. 1981, c. 520, provides in relevant part:  "(1) The licensing authorities of any city or town may grant, and after written notice to the licensee, suspend or revoke a license to keep and operate an automatic amusement device for hire, gain or reward . . . .

"(2) The term 'automatic amusement device' as used in this section shall be construed as meaning any mechanism whereby, upon the deposit therein of a coin or token, any apparatus is released or set in motion or put in a position where it may be set in motion for the purpose of playing any game involving, in whole or in part, the skill of the player, including, but not exclusively, such devices as are commonly known as pinball machines including free play pinball machines."

Caswell contends that G. L. c. 140, § 177A, is unconstitutional under the United States and Massachusetts Constitutions both on its face because it is impermissibly vague and as applied because it violates rights to free expression and association.[2] Caswell also asserts that, aside from the constitutional issues, the commission incorrectly interpreted the standard for denying a license application and that the evidence presented in this case is insufficient as a matter of law to support a denial of Caswell's application. We disagree with Caswell's constitutional arguments but conclude that the commission may have incorrectly interpreted and applied G. L. c. 140, § 177A.

The judge, in ruling upon the motions for summary judgment, had before him for consideration the entire record of the proceedings before the commission as well as supplementary affidavits. We summarize pertinent facts immediately below and in subsequent parts of this opinion.

In 1981, Caswell, a resident of Brockton and the owner of a local restaurant, sought to enter the business of operating an entertainment center featuring coin-operated video games. To this end, Caswell leased premises in a freestanding building adjacent to the Westgate Mall shopping area in Brockton. In April, 1981, he filed with the commission applications for licenses for seventy-five video games. At a public hearing, Caswell presented a comprehensive plan for the design, maintenance, and operation of his video game entertainment center. The plans called for carpeting and acoustical ceilings to minimize noise. The interior would be decorated with plants and the exterior would be finished and landscaped. The following rules would be posted at the center and strictly enforced: no smoking, eating, drinking, or loitering, and no school age children

---

[2] Caswell also argues that his substantive due process and equal protection rights were violated by the commission's denial of his license applications. Caswell, however, raises these arguments for the first time on appeal. Therefore, we decline to address them. See, e.g., *Penney* v. *First Nat'l Bank,* 385 Mass. 715, 723 (1982); *Stanley* v. *Ames,* 378 Mass. 364, 369 n.11 (1979).

admitted during school hours. To prevent loitering, Caswell's premises would have no seats. To ensure that the rules would be enforced and to control crowds, Caswell proposed to keep at least four people on duty at the center at any given time. Furthermore, at least one employee would patrol the parking area. Caswell planned to hire an off-duty police officer to patrol the parking area; he also agreed to contribute toward the cost of the security forces at the nearby Westgate Mall.

At the hearing, the commission considered written and telephone communication from community members and officials. The commission also heard testimony from a city councillor, an attorney representing the owners of the Westgate Mall, and a lieutenant of the Brockton police department. These people voiced opposition to the granting of the licenses. Various concerns with the arcade were expressed, including the adverse impact the proposed video center might have on an existing problem of youths congregating in the Westgate Mall area and on the high school's absentee rate. Concern was also expressed that patrons of Caswell's entertainment center would park in the Westgate Mall's shopping area and would cross a dangerous street to go to the arcade. The commission stated at Caswell's hearing that no policy exists against licensing video games or arcades. In July, 1981, the commission denied Caswell's applications, stating that the decision "was based on the opinion of the members that an arcade at this location would not be in the best interests of the City of Brockton." The commission cited "the proximity of Westgate Mall and the public safety problems which might arise therefrom" as particular concerns supporting the denial.

1. Caswell argues that G. L. c. 140, § 177A, on its face and as applied by the commission, violates fundamental rights of free expression under the United States and Massachusetts Constitutions. A dispositive threshold issue is whether the video game entertainment that Caswell sought to present is expression entitled to constitutional protec-

tion.[3] The First Amendment protects the communication or expression of ideas or information. See *Cohen* v. *California*, 403 U.S. 15, 25-26 (1971). Entertainment may come within the ambit of the First Amendment, but to gain protected status, that entertainment must be designed to communicate or express some idea or some information. See *Schad* v. *Mount Ephraim*, 452 U.S. 61, 65 (1981) (nude dancing); *Doran* v. *Salem Inn, Inc.*, 422 U.S. 922, 932-933 (1975) (nude dancing); *Erznoznik* v. *Jacksonville*, 422 U.S. 205, 208-210 (1975) (drive-in movies); *Southeastern Promotions, Ltd.* v. *Conrad*, 420 U.S. 546, 556-558 (1975) (stage musicals); *Schacht* v. *United States*, 398 U.S. 58, 62-63 (1970) (theatrical skit conducted on the street). The Supreme Court of California has suggested standards to be applied in determining which types of entertainment and amusement may be entitled to First Amendment protection. That court stated: "[N]o case has ever held or suggested that simple physical activity falls within the ambit of the First Amendment, at least in the absence of some element of communicating or advancing ideas or beliefs. . . . '[A]*ll* forms of communication, not merely the expression of concrete and definite ideas, *potentially* receive First Amendment protection.' . . . The key element is, of course, *communication*" (emphasis in original) (citation omitted). *Sunset Amusement Co.* v. *Police Comm'rs of Los Angeles*, 7 Cal. 3d 64, 74 (1972), appeal dismissed, 409 U.S. 1121 (1973), quoting *In re Giannini*, 69 Cal. 2d 563, 569 (1968), cert. denied, 395 U.S. 910 (1969), overruled in part on other grounds in *Crownover* v. *Musick*, 9 Cal. 3d 405, 424-428, 431 (1973), cert. denied sub nom. *Owen* v. *Musick*, 415

---

[3] Another threshold issue is whether Caswell has standing to assert the free speech rights of potential patrons of his video game arcade and of the creators of the games. See *Carey* v. *Population Servs. Int'l*, 431 U.S. 678, 682-684 (1977). We do not reach that issue, however, because Caswell clearly has standing to claim that he has a First Amendment right to present protected expression to the public. Cf. *Winters* v. *New York*, 333 U.S. 507, 510 (1948). Thus, we may consider whether video games are a form of protected expression without deciding whether Caswell has standing to raise the free speech rights of others.

U.S. 931 (1974). Under this standard, the court concluded that the physical activity of roller skating in a public roller skating rink was not protected speech because, although some expression might be involved, the patrons of the skating rink "primarily use the facilities for physical exercise and personal pleasure." *Sunset, supra.* The court noted that a nonobscene dance for an audience was protected because of the element of communication between the artist or performer and an audience. *Id.,* citing *Giannini, supra* at 567-572. See also *Commonwealth* v. *Blackgammon's, Inc.,* 382 Mass. 610, 622 (1981) (recreational dancing is "not to the same extent [a form] of expression protected by the First Amendment . . . [because recreational dancing] is not that of a performer, paid or otherwise, whose performance is presented for the entertainment of the public").

In this case it is clear that video games contain an element of physical activity. Indeed, an affidavit presented on behalf of Caswell states that "[s]uccessful play on these video games depends on the player's *eye-hand coordination, reflexes, muscular control,* concentration, practice, and on the player's understanding of the rules of play" (emphasis supplied). Nevertheless, Caswell argues that video games are deserving of First Amendment protection because they do contain communicative and expressive elements, analogous to motion picture and television entertainment. See *Oltmann* v. *Palos Hills,* No. 82 CH 3568, slip op. at 13-14 (Ill. Cir. Ct., Aug. 20, 1982) (trial judge determined that, since video games are similar to movies, they deserve First Amendment protection); *Gameways, Inc.* v. *McGuire,* N.Y.L.J., May 27, 1982, at 6, col. 2 (N.Y. Sup. Ct. May 3, 1982) (In ruling on motion for preliminary injunction, trial judge stated: "Considering the fact that other forms of expression no more 'informative' than video games — viewing nude dancing through a coin operated mechanism — have been recognized as constitutionally protected and the elusive line between informing and entertaining, this court concludes video games are a form of speech protected by the First Amendment"). Cf. *Stern Elecs., Inc.* v. *Kaufman,*

523 F. Supp. 635, 639 (E.D.N.Y. 1981) ("In essence, the [video game] is a movie in which the viewer participates in the action as the fearless pilot controlling the spaceship"), aff'd, 669 F.2d 852, 853-854, 856-857 (2d Cir. 1982). But see *America's Best Family Showplace Corp.* v. *City of N.Y.,* 536 F. Supp. 170, 173-174 (E.D.N.Y. 1982) (video games not protected speech because no element of information or idea is being communicated); *Playtime Games, Inc.* v. *City of N.Y.,* N.Y.L.J., June 15, 1982, at 12, col. 6 (N.Y. Sup. Ct. 1982) (following *America's Best*).

Caswell asserts that video games are similar to television and motion picture entertainment in that every video game computer program represents the author's expression of a particular idea or fantasy in a tangible form. This idea or fantasy, Caswell submits, is transmitted to the consumer by means of audio and visual effects. An affidavit presented on behalf of Caswell discusses the video game "Space Invaders" as representative of the other seventy-four games that Caswell proposed to license. The affidavit indicates that video games contain computer programs that are stored in a memory. These computer programs, with the aid of circuitry, a cathode ray tube, and speakers, can reproduce continuously an audio visual display of images for video game-playing. The affidavit also indicates that the computer programs have a plot or theme — in the case of Space Invaders, the game player must strive to shoot down attacking invaders before the player's own laser bases are destroyed.

On the record before us, however, we conclude that Caswell has not satisfied his burden of demonstrating that video games are or contain protected expression. Although the affidavit indicates that video games might involve the element of communication that is the sine qua non of First Amendment protection — for example, a player may strive to shoot down invaders — this showing is insufficient to demonstrate protected expression. We emphasize that nowhere in his pleadings or in affidavits submitted on his behalf does Caswell indicate that he has any further evidentiary showing to

make on the First Amendment issues in this case. We also note that, in the proceedings before the commission, Caswell never mentioned the applicability of the First Amendment to this case. We conclude that summary judgment was granted properly against Caswell despite Caswell's constitutional arguments, because he has failed to demonstrate that video games import sufficient communicative, expressive or informative elements to constitute expression protected under the First Amendment to the United States Constitution or art. 16 of the Massachusetts Declaration of Rights, as amended by art. 77 of the Amendments. From the record before us, it appears that any communication or expression of ideas that occurs during the playing of a video game is purely inconsequential. Caswell has succeeded in establishing only that video games are more technologically advanced games than pinball or chess. That technological advancement alone, however, does not impart First Amendment status to what is an otherwise unprotected game. Hence, we determine that on this record protected expression has not been shown.

2. Caswell maintains that G. L. c. 140, § 177A, both on its face and as applied, violates his potential patrons' rights to free assembly and freedom of association[4] arising under the First Amendment and art. 19 of the Massachusetts Declaration of Rights.[5] Freedom of association guarantees an

---

[4] A threshold issue is whether Caswell has standing to assert the constitutional rights of potential patrons of his or any video game arcade. See *Carey* v. *Population Servs. Int'l,* 431 U.S. 678, 682-684 (1977); *Craig* v. *Boren,* 429 U.S. 190, 192-196 (1976) (vendors may raise constitutional rights of their potential customers where legal duties created by statutory sections under challenge are addressed directly to vendors and where patrons' rights will be affected adversely if vendors' claims fail). Cf. *Broadrick* v. *Oklahoma,* 413 U.S. 601, 611-612 (1973) (in First Amendment cases, person may have standing to challenge hypothetical application of challenged statutory provisions to others not before Court). We dispose of Caswell's freedom of association arguments, however, on their merits and do not address the standing issues.

[5] We have concluded that art. 19 creates a right of association similar to that which exists in the First Amendment's guarantee of the people's right

opportunity for people to express their ideas and beliefs through membership or affiliation with a group. See, e.g., *NAACP* v. *Button,* 371 U.S. 415, 430-431 (1963); *NAACP* v. *Alabama ex rel. Patterson,* 357 U.S. 449, 460 (1958). In *Griswold* v. *Connecticut,* 381 U.S. 479, 483 (1965), the Supreme Court also indicated that this right protects "forms of 'association' that are not political in the customary sense but pertain to the social, legal, and economic benefit of the members." Cf. *Gilmore* v. *Montgomery,* 417 U.S. 556, 575 (1974), quoting *Moose Lodge No. 107* v. *Irvis,* 407 U.S. 163, 179-180 (1972) (Douglas, J., dissenting) ("The associational rights which our system honors permits all white, all black, all brown, and all yellow clubs to be formed. They also permit all Catholic, all Jewish, or all agnostic clubs to be established. Government may not tell a man or woman who his or her associates must be"). Caswell urges that potential patrons' freedom of association is infringed by the denial of his license applications because potential patrons have a right of access to his video game arcade. See *Aladdin's Castle, Inc.* v. *Mesquite,* 630 F.2d 1029, 1041-1042 (5th Cir. 1980), rev'd in part on other grounds, 455 U.S. 283 (1982). We disagree.

The Supreme Court's reasoning in freedom of association cases does not support a constitutional right on the part of potential patrons to gather at Caswell's proposed arcade for video game amusement. Caswell points to no identifiable group consisting of video game players. Furthermore, even if there were such an identifiable group, gathering in an amusement arcade for the purpose of playing video games would not advance the social, legal, and economic benefits of the group's members in the way that the freedom of association contemplates. Cf. *NAACP* v. *Button, supra* (freedom of association encompasses right of NAACP and its members to associate for purpose of assisting persons who seek legal redress of constitutional and other rights).

peacefully to assemble. *First Nat'l Bank* v. *Attorney Gen.,* 371 Mass. 773, 792 (1977), rev'd on other grounds, 435 U.S. 765 (1978). *Bowe* v. *Secretary of the Commonwealth,* 320 Mass. 230, 249 (1946).

3. Caswell contends that G. L. c. 140, § 177A, is unconstitutionally vague because it fails to set forth any standards to limit administrative discretion. A law is void for vagueness if persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Smith* v. *Goguen*, 415 U.S. 566, 572 n.8 (1974), quoting *Connally* v. *General Constr. Co.*, 269 U.S. 385, 391 (1926). Vague laws violate due process because individuals do not receive fair notice of the conduct proscribed by a statute, *Papachristou* v. *Jacksonville*, 405 U.S. 156, 162 (1972), and because vague laws that do not limit the exercise of discretion by officials engender the possibility of arbitrary and discriminatory enforcement, *Grayned* v. *Rockford*, 408 U.S. 104, 108-109 & n.4 (1972). Caswell acknowledges that laws which merely regulate business activities need not contain criteria as precise and definite as laws which affect First Amendment freedoms. We have stated that "[a] law which requires that the exercise of First Amendment rights be subject to license must contain narrow, objective and definite standards, or it is void for vagueness." *Fitchburg* v. *707 Main Corp.*, 369 Mass. 748, 752 (1976). Similarly, statutes that do not define or relate to criminal conduct need not be drawn as precisely as statutes that touch upon criminal acts. See *Saxon Coffee Shop* v. *Boston Licensing Bd.*, 380 Mass. 919, 925 (1980). Since neither First Amendment freedoms nor criminal conduct are concerned in this case, a less stringent vagueness standard applies. Thus, we limit our vagueness analysis to whether G. L. c. 140, § 177A, is unconstitutionally vague as applied in this case and do not consider whether G. L. c. 140, § 177A, would be void for vagueness if applied in a case where the video games at issue were shown to contain protected expression.[6]

---

[6] We emphasize that, even were we to determine that video games do involve protected speech, Caswell would not necessarily be entitled to his licenses. Potentially vague statutes may be construed to avoid constitutional infirmities. See *Fitchburg* v. *707 Main Corp.*, 369 Mass. 742, 752-753 (1976). See also *Erznoznik* v. *Jacksonville*, 422 U.S. 205, 216

Caswell argues further that, free speech and criminal statutes aside, absolute discretion is vested impermissibly in local licensing authorities under G. L. c. 140, § 177A. This broad grant of discretion, however, may be limited properly by judicial interpretation. See *Fitchburg* v. *707 Main Corp.*, 369 Mass. 748, 752-753 (1976). In *Turnpike Amusement Park* v. *Licensing Comm'n of Cambridge*, 343 Mass. 435, 438 (1962), we explained the nature of a local authority's duty in evaluating license applications under G. L. c. 140, § 177A. At issue in that case was the validity of a policy pronounced by the Cambridge licensing commission that it would not renew or issue licenses for any pinball machines. *Id.* at 436. We declared that "[t]he statute does not empower local licensing authorities to make such an over-all denial." *Id.* at 438. We stressed that "[l]ocal authorities may deny a particular license if in their discretion they find that the general good, order and welfare of the community so require. They cannot, however, act in an unreasonable or arbitrary manner and must consider and determine each application ' . . . on its own set of facts.'" *Id.*, quoting *Mosey Cafe* v. *Licensing Bd. for Boston*, 338 Mass. 199, 205 (1958). Thus, the local licensing authorities may consider "the intended location of the machines, the number of machines in a given area, or any other consideration which [they] might deem pertinent to the issuance of a license." *Turnpike Amusement Park, Inc., supra* at 437.

---

(1975). Cf. *Fantasy Book Shop* v. *Boston*, 652 F.2d 1115, 1123 (1st Cir. 1981). Furthermore, since video game entertainment involves and implicates public interests that are unrelated to any communicative aspect of video games, the State and the municipalities may regulate the licensing of these games. See *Fantasy Book Shop* v. *Boston*, 652 F.2d 1115, 1121 (1st Cir. 1981) ("[A] law requiring the licensing of [commercial public amusements] in an attempt to limit noise, traffic and disruption is clearly within a state's constitutional power"). See also *Young* v. *American Mini Theatres*, 427 U.S. 50, 62-63 (1976); *Hart Book Stores* v. *Edmisten*, 612 F.2d 821, 826-828 (4th Cir. 1979), cert. denied, 447 U.S. 929 (1980).

We conclude that G. L. c. 140, § 177A, as interpreted by us in *Turnpike Amusement*, is not unconstitutionally vague. The purpose of G. L. c. 140, § 177A, is "the preservation of public order at public entertainments." *Mosey Cafe* v. *Licensing Bd. for Boston*, 338 Mass. 199, 205 (1958).[7] Because § 177A is concerned with the impact of a particular video game or video game arcade on a particular community and because First Amendment freedoms are not involved in this case, the statute need not specify with great particularity the relevant considerations in evaluating a license application. Rather, the statute does and may confer "upon the licensing authorities a 'quasi judicial authority to determine the facts and to pass upon the application in each instance under the serious sense of responsibility imposed upon them by their official positions and the delicate character of the duty entrusted to them.'" *Mosey Cafe, supra*, quoting *Butler* v. *East Bridgewater*, 330 Mass. 33, 37 (1953). We emphasize that, although the statute does not list particular standards for the local authorities, these authorities may not act arbitrarily or capriciously. *Turnpike Amusement Park* v. *Licensing Comm'n of Cambridge*, *supra* at 438. *Mosey Cafe, supra*.

4. Caswell also contends that the commission committed a material and substantial error of law in its interpretation and application of G. L. c. 140, § 177A. Caswell urges that the commission required Caswell to demonstrate that his video game arcade would enhance the city of Brockton, and he argues that this requirement is invalid under the statute. We agree with Caswell that, if the commission applied such a standard, it acted incorrectly. A local licensing authority may not deny an applicant a license for a video game on the

---

[7] In *Mosey Cafe*, we held that G. L. c. 140, § 183A, was not unconstitutionally vague. *Mosey Cafe, Inc.* v. *Licensing Bd. for Boston*, 338 Mass. 199, 205 (1958). We are aware that in *Venuti* v. *Riordan*, 521 F. Supp. 1027, 1031 (D. Mass. 1981), Chief Judge Caffrey indicated that he thought we would probably not reach the same conclusion today. Since G. L. c. 140, § 183A, is not at issue in this case, we decline to express any opinion about Chief Judge Caffrey's conclusion.

ground that the city would not be enhanced, benefited, or somehow improved by the availability of the video game. Under our reasoning in *Turnpike Amusement Park* v. *Licensing Comm'n of Cambridge,* 343 Mass. 435, 438 (1962), the determination to be made in evaluating an application under G. L. c. 140, § 177A, is whether the proposed video game will detract from one or more aspects of the community. From the record before us, we cannot conclude that the commission did not deny Caswell's applications on the basis of an enhancement of the community standard. The chairman of the commission clearly indicated that enhancement of the community was a legitimate and essential factor.[8] We cannot determine the extent to which his mistaken interpretation of G. L. c. 140, § 177A, influenced the commission as a whole. The commission's denial states: "The decision of the Commission was based on the opinion of the members that an arcade at this location would not be in the best interests of the City of Brockton." Although the denial cites concern with "the proximity of Westgate Mall and the public safety problems which might arise therefrom," we are unable to ascertain whether the decision was based substantially on the chairman's incorrect interpretation of § 177A. In light of the extensive list of rules and regulations proposed by Caswell for his arcade and his willingness to hire his own security workers as well as to contribute to security forces at the nearby mall, we cannot determine that safety concerns actually

---

[8] The chairman stated at the hearing: "We have to have the greater look on whether this is going to do something for the general public of Brockton. Whom and what is this going to attract? What is this going to bring to the City of Brockton that we are missing, and that's what the role of this Board is going to be. Is this going to enhance the City of Brockton, or, if, in fact, those that want to go and play these games that if they can't find and don't choose to patronize any of the establishments where we have got them or go to Worcester, Cambridge, Newton, Revere, or Boston, and I say to you that's the question that this Board has to face. It's not just an unemployment problem. It's not one of using a restaurant that's half built. It's a more basic issue. It is what is this going to do for the average citizen in Brockton? What is this going to do for the average citizen in Brockton?"

motivated the commission. Therefore, the matter must be reconsidered by the commission and, if the applications are once more denied, a statement of the commission's reasons must be given.

5. Caswell's final contention is that the appropriate standard of review of the denial of an initial license application under G. L. c. 140, § 177A, is the substantial evidence test. Although we need not reach this issue because of our decision that the case requires clarification by the commission, we nevertheless address it. General Laws c. 140, § 177A, does not provide for either further administrative review or judicial review of decisions made by the commission. Furthermore, the commission is not a State "agency" within the meaning of the State Administrative Procedure Act, G. L. c. 30A, § 1 (2), and the provisions of that act, therefore, do not apply. See *Saxon Coffee Shop* v. *Boston Licensing Bd.*, 380 Mass. 919, 922-924 (1980). Caswell, therefore, properly brought this action in the Superior Court under G. L. c. 249, § 4, as a civil action in the nature of certiorari. See *Saxon Coffee Shop, supra.* The appropriate standard of judicial review in a certiorari case such as this must be determined according to "the nature of the action sought to be reviewed." *McSweeney* v. *Town Manager of Lexington*, 379 Mass. 794, 800 (1980), quoting *Boston Edison Co.* v. *Boston Redevelopment Auth.*, 374 Mass. 37, 49 (1977). See also *Konstantopoulos* v. *Whately*, 384 Mass. 123, 137 (1981). In this case, we consider whether, as Caswell contends, the substantial evidence test should apply or whether the standard of review should be limited to examining whether the local licensing authority acted arbitrarily or capriciously, abused its discretion, or made an error of law. See *McSweeney, supra.* In *Turnpike Amusement Park* v. *Licensing Comm'n of Cambridge*, 343 Mass. 435, 438 (1962), we indicated that local licensing authorities are vested with discretion in evaluating license applications under G. L. c. 140, § 177A. We did not resolve, however, whether judicial review of a local licensing authority's actions would be limited to a lesser standard

of review than the substantial evidence test. In addressing this issue, we note that G. L. c. 140, § 177A, does not require that a hearing be held by the commission. Compare *Saxon Coffee Shop, supra* at 924. Furthermore, the statute does not contain narrow and objective criteria to be applied by authorities in evaluating license applications. Compare *Fantasy Book Shop* v. *Boston*, 652 F.2d 1115, 1123 (1st Cir. 1981), with *McSweeney* v. *Town Manager of Lexington*, 379 Mass. 794, 796-800 (1980). We conclude that, in an action for judicial review of a local licensing authority's denial of an initial application for a license under G. L. c. 140, § 177A, where First Amendment rights are not involved,[9] the appropriate standard of review is error of law or abuse of discretion, as measured by the "arbitrary or capricious" test.

The summary judgment is reversed, and the case is remanded to the Superior Court, there to be returned to the commission for reconsideration of its decision and, if Caswell's applications are again denied, a statement of the commission's reasons therefor. Thereafter, if necessary, further proceedings consistent with this opinion are to be had in the Superior Court.

*So ordered.*

---

[9] We again point out that we limit our analysis to the facts of this case, where protected expression has not been demonstrated. If First Amendment rights were involved, a strong argument could be made that the standard of review should be higher than an abuse of discretion or error of law standard and that the licensing authority should carry the burden of proving that the denial of the license application is justified. See *1001 Plays, Inc.* v. *Mayor of Boston, post* 879, 883 n.4.