YERARDI'S MOODY STREET RESTAURANT AND LOUNGE, INC.
*vs.* BOARD OF SELECTMEN OF RANDOLPH & another.[1]

Suffolk. December 10, 1984. — January 31, 1985.

Present: BROWN, KAPLAN, & SMITH, JJ.

*Alcoholic Liquors,* License. *Alcoholic Beverages Control Commission.*
*Practice, Civil,* Action in nature of certiorari. *Administrative Law,* Hearing, Judicial review. *Due Process of Law,* Hearing.

After judicial review under G. L. c. 249, § 4, a town's board of selectmen
was required to reconsider its decision denying the petition of an all-alcoholic beverages licensee with a closing time of 1:00 A.M., for an
extension of its closing time to 2:00 A.M., where the record of the board's
proceedings established that the licensee's situation was similar to that
of its competitors in the vicinity who were closing at 2:00 A.M., and
that the board was not phasing out later closing times, and where an
affidavit of three of the board's members stating reasons for their action
was inadequate to explain the board's decision. [299-302]
Discussion regarding the advisability of affording a hearing when a government agency exerts power upon an individual, even though the statute
under which the agency acts does not in terms require a hearing. [302-304]

CIVIL ACTION commenced in the Superior Court Department
on May 19, 1982.

The case was heard by *Robert A. Mulligan, J.,* on a motion
for summary judgment.

*Michael W. Reilly* for the plaintiff.

*William J. Carr,* Town Counsel (*Jonathan C. Young* with
him) for Board of Selectmen of Randolph.

KAPLAN, J. The plaintiff Yerardi's Moody Street Restaurant
and Lounge, Inc. (Yerardi), the holder of an all-alcoholic beverages license with a closing time of 1:00 A.M., petitioned the
board of selectmen of Randolph (board), the local licensing

---

[1] Alcoholic Beverages Control Commission. The summary judgment in
its favor is not contested.

authority, to "extend" the closing time to 2:00 A.M. After hearing, the board denied the petition. Yerardi then brought the present action to annul the board's decision. A judge of the Superior Court upheld the board. We reverse and remand so that the board may reconsider the petition in the light of this opinion.

*Statement.* Although not so designated by the parties, this action should be understood to be a civil action in the nature of certiorari as contemplated by G. L. c. 249, § 4, with the function of bringing up the action of the board for such judicial review as may be available. The record here consisted of the minutes of the relevant board hearings together with certain supplemental affidavits. The board moved to dismiss. Treating the motion as one for summary judgment, the judge allowed it. Following are the facts disclosed of record.

In August, 1980, Yerardi applied for a transfer of the instant license from Creative Dining Concepts, Inc., to itself. The board considered the application at meetings on August 25 and September 8, 1980. It was represented that there had been problems with the licensee over the past year or two; after-hours drinking and parking were mentioned. Would there be adequate control under the new management? Some assurances were given on this point. The town's chief of police did not object to the proposed transfer. After discussion, the board, by a vote of 2-1, approved the transfer but with the condition that the 2:00 A.M. closing enjoyed by the transferor be changed to 1:00 A.M.

Yerardi appealed to the Alcoholic Beverages Control Commission (ABCC), attacking the 1:00 A.M. condition on the transfer, and also brought an ancillary action against ABCC and the board in the Superior Court in Norfolk County. Yerardi failed at the ABCC, and the action was dismissed by stipulation of the parties on April 16, 1981.

On August 10, 1981, the board considered and denied an application by Yerardi to extend the closing hour to 2:00 A.M. Yerardi sought review of the decision by the ABCC but that

body wrote that it had no jurisdiction.[2] Again, on April 12, 1982, the local board heard an application to extend. The board afforded a hearing. On analogy, it seems, to the procedure upon an application for an original license (see c. 138, § 15A), it required Yerardi to publish notice and to give notice to abutters of the hearing.[3] On that occasion, Yerardi by its counsel pointed out, and there was no contradiction, that four other licensees in the vicinity, whose situations in relevant respects were similar to Yerardi's, held 2:00 A.M. licenses;[4] that Yerardi's experience in the way of calls for police assistance compared favorably with the others'; and that the town's chief of police and safety officer did not object to the proposed extension. There was indication, further, that some Yerardi customers, upon leaving the place around 1:00 A.M., went to the other competing locations to continue drinking.

As opposed to Yerardi's submission, one or more speakers expressed the feeling that 2:00 A.M. closings should be pushed back. In that connection, Yerardi showed as part of the materials on the summary judgment motions that, on dates subsequent to the board's decision of April 12, 1982, denying an extension for Yerardi, the board voted down a proposal for a general roll back to 1:00 A.M., and approved a transfer of a 2:00 A.M. license held by one of the four licensees mentioned without imposing a cut to 1:00 A.M.

The board's decision on April 12 by a 3-2 vote to deny Yerardi's application was not accompanied by a statement of reasons. However, an affidavit of December 20, 1982, by the three selectmen, submitted on the motions, stated that they "individually and collectively had in mind" the following: At the time of the 1980 transfer of license, Yerardi raised no

---

[2] ABCC took the same position in respect to the board's second denial of an extension mentioned below.

[3] Yerardi has argued that § 15A covers an application to extend closing hours, but the language of § 15A does not support this view.

[4] At one point in the record there is an intimation that there were five other licensees in the vicinity of which four, whose situations were similar to Yerardi's, had 2:00 A.M. closings.

objection to the 1:00 A.M. closing;[5] over the last two years on the South Shore there had been "a great deal of media coverage and citizen reaction to accidents and deaths" from drunken driving; some municipalities had rolled back closing hours and others were considering doing so. The affidavit also stated: "These are not all of our reasons."

*Statutory background.* By G. L. c. 138, § 12, sixth par., as appearing in St. 1977, c. 929, § 2,[6] questions of closing hours in the period 11:00 P.M. to 2:00 A.M. are committed to the local licensing authorities; the ABCC was right in disclaiming jurisdiction, compare *Casa Loma, Inc.* v. *Alcoholic Beverages Control Commn.*, 377 Mass. 231 (1979), and the State Administrative Procedure Act, G. L. c. 30A, is not relevant. *Id.* at 235. The statutory standard that governs a local authority in choosing this or that closing hour — whether as a general regulation or for a particular licensee — is "the public need." See *Pronghorn* v. *Licensing Bd. of Peabody,* 13 Mass. App. Ct. 70, 73 (1982). In case of a proposal to decrease hours of business of any licensee, the local authority is expressly directed to hold a public hearing on notice. The statute does not mention proposals to increase hours and so does not speak of

---

[5] But, as noted, Yerardi did attempt an attack upon this condition of the transfer. Also, it was open to Yerardi to contend that its performance after the transfer improved upon its predecessor's and warranted an extension to 2:00 A.M.

[6] "The hours during which sales of such alcoholic beverages may be made by any licensee as aforesaid shall be fixed by the local licensing authorities either generally or specially for each licensee; provided, that no such sale shall be made on any secular day between the hours of two and eight o'clock antemeridian and that, except as provided in section thirty-three [sales on Sundays and holidays], no such licensee shall be barred from making such sales on any such day after eleven o'clock antemeridian and before eleven o'clock postmeridian, . . . and provided further, that any such licensee and his employees shall not be prohibited from being upon such premises at any time for the purpose of cleaning, making emergency repairs to, or providing security for, such premises or preparing food for the day's business or opening or closing the business in an orderly manner. The licensing authority shall not decrease the hours during which sales of such alcoholic beverages may he made by any licensee until after a public hearing concerning the public need for such decrease; provided, that any licensee affected by such change shall be given two weeks notice of such public hearing . . . ."

hearings on such matters. There is no express provision in § 12, sixth par., for judicial review of a local authority's decision decreasing hours and, of course, none regarding a decision denying an increase of hours.

*Judge's position.* In ruling for the board, the judge wrote that there was no legal requirement that Yerardi be accorded any hearing on its application. He also said that the record on the hearing that had been held was sufficient to support the board's decision as being neither arbitrary nor capricious, even though he, the judge, might think the evidence preponderated in Yerardi's favor.

*Analysis.* A "civil action in the nature of certiorari" pursuant to G. L. c. 249, § 4, serves to "correct errors" in administrative proceedings by means of judicial review where such oversight is not otherwise provided by statute. See *Reading* v. *Attorney General,* 362 Mass. 266, 269-272 (1972); *McSweeney* v. *Town Manager of Lexington,* 379 Mass. 794, 799 (1980); *Saxon Coffee Shop, Inc.* v. *Boston Licensing Bd.,* 380 Mass. 919, 923 (1980). Cf. *Hill* v. *Superintendent, Mass. Correctional Inst., Walpole,* 392 Mass. 198, 199 n.2 (1984). The nature or scope of the review accommodates to the kind of administrative decision involved, and this in turn is conditioned by the type of substantive rule or standard that is being applied. See *McSweeney, supra* at 799-800; *Saxon, supra* at 923-925; *Newbury Junior College* v. *Brookline, ante* 197, 201-203 (1985). By the teaching of *Caswell* v. *Licensing Commn. for Brockton,* 387 Mass. 864 (1983), the fact that a statute empowering a given administrative agency does not contain "narrow and objective criteria" (at 878), but rather refers to a broad standard, tends to indicate that judicial review does not extend to an assessment of the strength of the evidence supporting the agency's action, but is limited to a search for "error of law or abuse of discretion, as measured by the arbitrary or capricious test." (At 878).[7] "[T]he public need," as appearing in G. L.

---

[7] The absence of an express statutory requirement of a hearing is cited in *Caswell* apparently as a factor looking to an "arbitrary-or-capricious" test as the appropriate standard of review (at 878). And see the discussion of hearings under the caption below.

c. 138, § 12, sixth par., is certainly well removed from a narrow or objective criterion; and *Casa Loma,* 377 Mass. at 234, finding no error in a local authority's decrease of a licensee's hours under § 12, sixth par., discerned "a legislative intention to permit unreviewable policy considerations to govern the availability of 'extra' hours for licensees." We think the same holds for the denial of an increase of hours. However, the discretion lodged in the local authorities is not unlimited. These agencies may not act upon mere whim or vagary. Put another way, besides the unreviewable elements in the agency decisions, there are other elements submissible to the test of elementary justice that is invoked by the words "arbitrary or capricious." That test was the point of reference in *Pronghorn,* 13 Mass. App. Ct. at 74, even where the agency action under review was a general roll back of the closing hour in the locality, as distinguished from agency action directed to a single licensee.[8] See also *Newbury, supra* at 202-203.

In the present case, we have to consider whether there is cause to believe that the agency, by gross illogic, has arbitrarily singled out an individual for unequal and perhaps invidious treatment. The judge below did not deal with the specifics.

Yerardi established in the record that its situation was similar to that of its competitors in the vicinity who were enjoying 2:00 A.M. closings. Nor could it be said that the board was phasing out these closings as licenses were transferred: a transfer was voted without a roll back, and another proposal to adopt a 1:00 A.M. over-all closing failed of adoption. The affidavit stating what the members "had in mind" hardly explains their decision of Yerardi's case; and the statement that the reasons set out were "not all of our reasons" teases a court without enlightening it.

Accordingly we think the board ought to reconsider Yerardi's application. By no means are we saying that the board should find for Yerardi. It may well be, for example, that a combina-

---

[8] "[U]nless that discretion is exercised in a manner that is arbitrary or capricious or is based on improper or unlawful considerations, the policy determined by the local board is substantially immune from judicial review." 13 Mass. App. Ct. at 74.

tion of "unreviewable policy considerations" with reasons that the board members did not disclose will amply justify their negative decision. The question is open on remand.

*Hearings*: We add a word about the judge's remark that there was no legal requirement that Yerardi be given a hearing. The statute, indeed, did not call for a hearing, and that omission may be said to be in some significant contrast with the provision for hearings where business hours are reduced. Still, looking only to practicalities, the board was well advised to allow Yerardi a hearing: this for the plain reason that arbitrariness or caprice is the more readily found by a court in an agency decision where the individual affected has not been given a chance to have its say. Thus the judicial review contemplated by the certiorari action of G. L. c. 249, § 4, suggests to agencies that hearings should be allowed even when the governing statutes remain silent on the point. The general observation to be made is that judicial review, as accorded by such a statute as G. L. c. 249, § 4, naturally draws with it the advisability if not the necessity of some appropriate hearing. Just so, the agency involved in the *Caswell* case, *supra,* afforded a hearing although the pertinent statute (G. L. c. 140, § 177A: license for video games) did not in terms require it, and the phenomenon is probably quite common.

If the question of hearing is approached head on, rather than as an incident of judicial review, a case can be made with some show of strength that in a confrontation like Yerardi's the individual is entitled to a hearing. In various aspects of licensing — for instance, grant and revocation of license — procedural due process, constitutionally guaranteed, has been seen to require a hearing. See *Konstantopoulos* v. *Whately,* 384 Mass. 123, 132-133 (1981); *Foster from Gloucester, Inc.* v. *City Council of Gloucester,* 10 Mass. App. Ct. 284, 291 (1980); *Hornsby* v. *Allen,* 326 F.2d 605, 607-610 (5th Cir. 1964). There may be a like requirement with respect to a contested condition upon a license, as in the present case. In one view, Yerardi asserts, as a "property" interest, a right not to be unjustly prejudiced in competing with businesses similarly situated. The right to some minimal hearing to consider the

claim of prejudice would follow as a constitutional consequence.[9] In another, and less conventional view, Yerardi asserts a possible "liberty" interest in being free from wayward or undisciplined administrative decision making, and this implicates a hearing. See the discussion by Van Alstyne, Cracks in "The New Property": Adjudicative Due Process in the Administrative State, 62 Cornell L.Q. 445, 483 (1977); Tribe, American Constitutional Law § 10-12, at 538-539; see also § 10-7 (1978).[10]

The claim to a hearing, however, need not be pressed to a constitutional limit. In this Commonwealth the right to a hearing where government exerts power upon an individual in a matter of consequence has been related, on occasion, not strictly to the Constitution, but to an ethic that pervades our legal system. See *Milligan* v. *Board of Reg. in Pharmacy,* 348 Mass. 491, 495-496 (1965), quoting Professor Davis' observation about "a kind of common law . . . unanchored to any constitutional or statutory provision" that assures a hearing to a party with a sufficient interest at stake in governmental action directed to him. 1 Davis, Administrative Law § 7.02, at 412 (1958). See also *Konstantopoulos,* 384 Mass. at 132.

Turning to the procedure that is appropriate at a hearing before the board in Yerardi's case, we can say that it need not respond to a rigid formula or the evidentiary niceties found in

---

[9] *Hornsby, supra,* dealt with the denial, without assigned reason, of an application for a license to open a retail liquor store. Tuttle, C. J., wrote that it was a constitutional deprivation to deny the applicant a hearing with procedural safeguards where she asserted that she satisfied all requirements for the license and had been denied it on a basis of "ward courtesy" (licensing authority bowed to desires of aldermen of ward in which store was located). Further, it would offend equal protection to refuse licenses to one group when others obtained licenses in similar circumstances. In these respects it did not matter that the State had extensive powers of regulation of the liquor trade (at 609-610). Cf. *Ewing* v. *Regents of Univ. of Michigan,* 742 F.2d 913 (6th Cir. 1984).

[10] This less conventional, "intrinsic" (as contrasted with "instrumental") idea of procedural due process is probably more spacious than the current conception of the United States Supreme Court. See *Kulas* v. *Personnel Commn. of N.H.,* 118 N.H. 387, 391 (1978). Cf. *Cassesso* v. *Commissioner of Correction,* 390 Mass. 419, 424 & n.6 (1983).

a courtroom.[11] It should tend toward the adjudicatory rather that the regulatory model because the object of the exercise is not to formulate a general rule of governance, but to reach a decision in a particular case in the light of the loose substantive standard established by statute. Yerardi did not complain of the procedure that was actually followed in the hearing afforded to it by the board. We add that, where the board denies relief to the individual, it would do well to state its reasons at or near the time of decision. Cf. *Caswell,* 387 Mass. at 875-877. This aids the board in reaching a correct result, besides helping the court in the process of review, if that should occur. Obviously inferior for both purposes is a post hoc justification like that attempted by the board members here when their decision was challenged by Yerardi's institution of the present action.

*Conclusion.* The summary judgment is reversed, and the case is remanded to the Superior Court, there to be returned to the board for reconsideration of its decision, with liberty to receive further evidence. Thereafter, if necessary, further proceedings consistent with this opinion will be had in the Superior Court.

*So ordered.*

---

[11] See Friendly, Some Kind of Hearing, 123 U. Pa.L. Rev. 1267 (1975).