NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

17-P-203                                          Appeals Court


WALTER H. JACOBS  vs.  MASSACHUSETTS DIVISION OF MEDICAL
                          ASSISTANCE.


No. 17-P-203.

Suffolk.       November 1, 2019. - April 10, 2020.

Present:  Agnes, Sullivan, & Blake, JJ.


MassHealth.  Medicaid.  Division of Medical Assistance.
     Administrative Law, Hearing, Judicial review, Substantial
     evidence, Evidence.  Due Process of Law, Administrative
     hearing.



     Civil action commenced in the Superior Court Department on
September 30, 2009.

     The case was heard by Paul D. Wilson, J., on a motion for
judgment on the pleadings.


     Walter H. Jacobs, pro se.
     Cassandra Bolanos, Assistant Attorney General, for the
defendant.


     AGNES, J.  This case concerns the treatment of patients who

receive medical benefits through the Massachusetts Medicaid

program known as MassHealth,[1] and the requirements that physicians must follow to be paid for services provided to those patients. The plaintiff, Walter H. Jacobs, was a primary care physician who billed MassHealth for services that he claimed to have provided to MassHealth patients. MassHealth, after conducting a required peer review of Jacobs's records, found that he had repeatedly violated quality of care, record-keeping, and billing standards. Jacobs unsuccessfully challenged those findings during an administrative hearing and then sought review of the administrative decision in the Superior Court. For the reasons that follow, we affirm the judgment entered in the Superior Court upholding the administrative decision.

Background. MassHealth, as a State Medicaid program, covers medical expenses for certain individuals who would be otherwise unable to afford necessary medical care. See Daley v. Secretary of the Executive Office of Health & Human Servs., 477 Mass. 188, 189 (2017). While State Medicaid programs are run in cooperation with the Federal government, MassHealth is a major expenditure for Massachusetts, which finances a significant portion of the benefits on its own. See id. at 189-190.

---

[1] The defendant, the Massachusetts division of medical assistance, which is part of the Executive Office of Health and Human Services, administers MassHealth. See G. L. c. 118E, § 1. We refer to both the division of medical assistance and the program it administers as MassHealth.

Physicians who participate in the program and seek payment for services provided to MassHealth patients therefore must comply with a variety of billing regulations that require, among other things, that physicians maintain "adequate documentation to substantiate the provision of services payable under MassHealth."  130 Code Mass. Regs. § 450.205(A) (2017).

On May 9, 2003, MassHealth notified Jacobs that, as required by Federal and State law, it had contracted with an entity referred to as MassPRO to conduct a "peer review of services rendered by providers to MassHealth members."[2]  The purpose of the review, as described by the notice sent to Jacobs, was "to determine whether the services provided were medically necessary, appropriate and of a quality that meets professionally recognized standards of care."  On May 14, 2003, MassPRO contacted Jacobs and requested "copies of any and all initial evaluations; history and physical exams; medical records; appointment books; laboratory and diagnostic reports and any and all other pertinent information for the [twenty-five patients] listed on the attached listings for services provided

---

[2] Federal regulations require any State that participates in Medicaid to "implement a statewide surveillance and utilization control program that . . . [s]afeguards against unnecessary or inappropriate use of Medicaid services and against excess payments."  42 C.F.R. § 456.3(a).  State law requires MassHealth to "verify the accuracy of bills submitted . . . through the application of statistical sampling methods."  G. L. c. 118E, § 38.

during the period of January 1, 2002 through December 31, 2002." Upon receipt of Jacobs's records, MassPRO conducted its review and then sent a draft report to MassHealth, which further reviewed a random sample of eight MassHealth patients from Jacobs's records.

Following the 2003-2004 review process, MassHealth sent an initial notice to Jacobs citing more than 900 quality of care, record-keeping, and billing violations across 371 office visits. MassHealth suspended Jacobs from participating in MassHealth for two years, effective immediately. Jacobs objected to the initial notice. In 2005, after further review, MassHealth sent two final notices to Jacobs. These notices confirmed the vast majority of the violations that were identified in the initial notice, while also citing additional violations.[3] MassHealth notified Jacobs of the violations and sought reimbursement in the amount of $127,794.86.

A twenty-eight day administrative hearing followed in 2007 and 2008, during which MassHealth relied in large part on the expert testimony of Jerome D. Siegel, a board-certified physician who was also a MassPRO reviewer. Dr. George Abraham, a board-certified physician, and Richard Hamilton, a managing

---

[3] The initial final notice failed to address six violations that Jacobs had appealed. The amended final notice addressed the six additional violations.

partner at an accounting and auditing firm that specialized in medical records review, testified for Jacobs. Jacobs also testified on his own behalf. The hearing officer, who had also reviewed the voluminous pages of exhibits, thereafter issued a 463-page decision containing specific findings with respect to every office visit that served as the basis for one of the violations listed in the amended final notice.

We summarize the facts as found by the hearing officer.[4] As to the quality of care violations, Jacobs's expert, Dr. Abraham, testified that the primary determinant in assessing quality of care was the result of that care, that is, whether the patient died or suffered other detrimental effects. The hearing officer did not credit this testimony and instead credited Dr. Siegel's testimony that quality of care should be determined by the information contained in Jacobs's records. Those records showed Jacobs's consistent failure, among other concerning practices, to document vital signs and the need for prescribed medications. For example, regarding a woman who was seven months pregnant, the hearing officer noted that "it is difficult to fathom a definition of quality of care that does not include documenting

---

[4] In his brief, Jacobs does not argue that any of the facts found in that decision were not supported by substantial evidence. While Jacobs suggested otherwise during oral argument, the issue has been waived. See Santos v. U.S. Bank Nat'l Ass'n, 89 Mass. App Ct. 687, 700 n.14 (2016).

blood pressure . . . to rule out pre-eclampsia." The hearing officer noted, "The factual documentation . . . in every [patient's] record and date of service voluminously supports the violations alleged. Dr. Abraham's opinion and conclusions that the documentation supports a finding that the standard of medical care has been met because the [patient] either did not die, or end up in the emergency room is silenced in the face of the factual evidence which again irretrievably taints his credibility . . . ."

The records also failed to demonstrate the need for certain medications. The hearing officer found that Jacobs repeatedly prescribed often high doses of opioids without a documented basis, including to patients with known substance use problems or to patients who exhibited "drug indiscretion and drug seeking behavior."

As to the record-keeping violations, the hearing officer credited Dr. Siegel's testimony that a patient's name and date of birth should be on every page of their record, because "[t]his requirement safeguards against the obvious risk of a [patient's] file being compromised by error or if a page falls from the file." The hearing officer found that Jacobs's records did not satisfy this basic requirement and that, moreover, Jacobs's records were "scant and nearly impossible to read."

In analyzing the billing violations, the hearing officer first considered and rejected arguments made by Jacobs regarding the applicable guidelines for making billing decisions.  As found by the hearing officer, physicians are required to bill MassHealth for their services using numeric codes (CPT codes) listed in the current procedural terminology manual published by the American Medical Association (CPT manual), with the different CPT codes reflecting different rates of reimbursement. Jacobs argued that, contrary to MassHealth's practice of interpreting the CPT codes using the CPT manual in and of itself, the CPT codes had to be interpreted using two additional guidelines published by the Centers for Medicare and Medicaid Services[5] in 1995 and 1997 (CMS guidelines).  While the hearing officer acknowledged that Medicare's practice is to interpret the CPT codes using the CMS guidelines, the hearing officer further noted that Medicare and Medicaid are distinct programs with different "[f]unding sources, reimbursement rates, claims processing, rate setting, . . . populations served, and eligibility criteria."  He thus concluded that, regardless of Medicare's practice, a State Medicaid program such as MassHealth was not required to interpret the CPT codes using the CMS guidelines.

---

[5] The Centers for Medicare and Medicaid Services is a Federal agency that administers both of those programs.

Turning to the substance of the billing violations, the hearing officer noted that Jacobs most often used CPT code 99214, reflecting the second highest relevant rate of reimbursement. Use of CPT code 99214 requires at least two of the following three components: a "detailed history," a "detailed examination," and "medical decision-making of moderate complexity." While Jacob's expert, Hamilton, opined that Jacobs's use of CPT code 99214 was warranted one hundred percent of the time, the hearing officer found this testimony to be "spurious" in light of the scant and illegible nature of Jacobs's records. The hearing officer instead credited Dr. Siegel's testimony regarding the inadequacy of Jacobs's documentation of his examination and treatment of his patients. For example, with respect to one patient whose weekly office visits Jacobs billed using that code, the hearing officer found that "it [was not] clear why the [patient] [was] seen every week for what [was] purportedly a detailed examination," especially when "the visits [were] for refills of Ritalin" and "there [was] no reason evident in the medical record why the [patient] could not obtain renewal by mail or phone." The hearing officer found that Jacobs's records did "not meet professionally recognized standards of health care," and that the treatment was "not substantiated by records including evidence of such medical necessity and quality." Jacobs purported to perform

cardiovascular and respiratory examinations on other patients; the hearing officer found that nothing in Jacobs's records indicated that he took any vital signs such as blood pressure, pulse, or respiratory rate.

After finding that charged violations occurred in all 371 office visits, the hearing officer authorized MassHealth to proceed with recoupment of the overpayment.

Discussion.  An appellate court reviewing the judgment of a Superior Court judge that affirms the conclusion of an administrative agency will uphold the administrative conclusion unless, among other grounds, it is "[b]ased upon an error of law," G. L. c. 30A, § 14 (7) (c), or "[a]rbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law," G. L. c. 30A, § 14 (7) (g).  See Rudow v. Commissioner of the Div. of Med. Assistance, 429 Mass. 218, 223 (1999).  In making these determinations, we "give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it."  G. L. c. 30A, § 14.

1.  Billing violations.  Jacobs's brief raises several arguments with respect to the billing violations but does not raise any arguments with respect to the quality of care or

record-keeping violations.[6]  This is noteworthy, as all but

twenty-five of the 371 office visits that formed the basis for

MassHealth's determination of overpayment involved quality of

care or record-keeping violations.  A significant portion of the

determination of overpayment could thus be upheld on that basis.

See Barkan v. Zoning Bd. of Appeals of Truro, 95 Mass. App. Ct.

378, 391 (2019) (affirming on alternative ground on which

plaintiff's limited arguments were unpersuasive).  Because

twenty-five of the office visits do turn on Jacobs's arguments

with respect to the billing violations, we address those

arguments.

Jacobs contends that the hearing officer erred in failing

to consider the manner in which CPT codes have been interpreted

by the CMS guidelines.  Jacobs argues that MassHealth must

interpret the CPT codes using the CMS guidelines and that,

alternatively, the CPT codes and manual are inherently vague

when not interpreted using the CMS guidelines.[7]

---

[6] At oral argument, Jacobs suggested that he was challenging the quality of care and record-keeping violations.  Because his brief, however, does not raise any issues with respect to those violations, the issues have been waived.  See note 4, supra.

[7] Jacobs also argues that Dr. Siegel's testimony as to why Jacobs should not have used CPT code 99214 amounted to a new standard that the Legislature must promulgate pursuant to the Administrative Procedure Act, G. L. c. 30A.  Where this argument was not raised below, it has been waived.  See Smith v. Sex Offender Registry Bd., 65 Mass. App. Ct. 803, 810 (2006). Regardless, the argument is without merit.  Choice of CPT code

We first note that Jacobs has not offered any persuasive support for the proposition that MassHealth must interpret the CPT codes using the CMS guidelines.  As the hearing officer acknowledged, Medicare's practice is to interpret the CPT codes using the CMS guidelines.  As the hearing officer also noted, however, Medicare and Medicaid are distinct programs, and MassHealth, as a State Medicaid program, need not follow Medicare's informal practices.  See Rudow, 429 Mass. at 227-228.  Jacobs does not appear to contest this on appeal and instead relies on a letter that MassHealth sent to physicians in 2002, which directed physicians to use the CPT codes when billing MassHealth and further stated that MassHealth "pays for most of the Centers for Medicare and Medicaid Services [Healthcare] Common Procedure Coding System (HCPCS) codes" (HCPCS codes).  HCPCS does not incorporate the CMS guidelines.  Instead, the HCPCS is comprised of the CPT codes that document physician services along with another coding system used for products and services not covered by the CPT manual.  Jacobs argues that MassHealth cannot purport to cover the HCPCS codes while

---

necessarily involves some degree of clinical judgment.  This clinical judgment must, however, meet "professionally recognized standards of health care."  130 Code Mass. Regs. § 450.204(B) (2017).  Dr. Siegel did nothing more than offer his expert opinion on the factual question whether Jacobs's clinical judgment fell within professionally recognized standards of care.

ignoring how those codes have been interpreted by the CMS guidelines.  We see no such logical inconsistency.  As a preliminary matter, Jacobs has not pointed to anything in the record, nor do we see anything, that provides that the HCPCS codes must be interpreted using the CMS guidelines.  The information in the record regarding the HCPCS codes instead indicates that they incorporate the CPT codes while also providing additional codes for medical equipment not addressed in the CPT codes.  The statement that MassHealth covers most of the HCPCS codes is thus entirely consistent with MassHealth's practice of interpreting the CPT codes using the CPT manual in and of itself.  In fact, the CMS guidelines refer readers to the CPT manual for "complete descriptors . . . and instructions" for selecting a CPT code.[8]

Jacobs also argues that the CPT codes and manual are inherently vague unless interpreted using the CMS guidelines.  Because this case does not concern criminal activity or present concerns involving the First Amendment to the United States Constitution, our inquiry is limited to whether the CPT codes

---

[8] Jacobs's reliance on G. L. c. 118E, § 62 (a), which provides that "the executive office of health and human services . . . shall, without local customization, accept and recognize patient diagnostic information and patient care services and procedure information submitted pursuant to, and consistent with, . . . the Centers for Medicare and Medicaid Services Healthcare Common Procedure Coding System," is unpersuasive for the same reason.

and manual are vague as applied to Jacobs.  See <u>Daddario</u> v. <u>Cape Cod Comm'n</u>, 56 Mass. App. Ct. 764, 771 (2002).  For Jacobs's argument to succeed, the CPT codes and manual must be so vague that people "of common intelligence must necessarily guess at [their] meaning and differ as to [their] application," thereby subjecting people to "untrammeled" discretion (quotations and citation omitted).  <u>Id</u>. at 770.  See <u>Caswell</u> v. <u>Licensing Comm'n for Brockton</u>, 387 Mass. 864, 873 (1983).

Applying these standards, we have no difficulty concluding that Jacobs's argument regarding the vagueness of the CPT codes and manual is without merit.  As noted <u>supra</u>, use of CPT code 99214 requires two of the following three components:  a "detailed history," a "detailed examination," and "medical decision-making of moderate complexity."  The CPT manual describes each of these components.  A "detailed history" means "chief complaint; extended history of present illness; problem pertinent system review extended to include a review of a limited number of additional systems; pertinent past, family, and/or social history directly related to the patient's problems."[9]  A "detailed examination" involves "an extended examination of the affected body area(s) and other symptomatic

_____

[9] The CPT manual further describes what is meant by "chief complaint," "history of present illness," "system review," "family history," "past history," and "social history."

or related organ system(s)."  Lastly, the CPT manual provides physicians with three different factors to use in determining whether a medical decision is moderately complex:  (1) the "[n]umber of [d]iagnoses or [m]anagement [o]ptions," (2) the "[a]mount and/or [c]omplexity of [d]ata to be [r]eviewed," and (3) the "[r]isk of [c]omplications and/or [m]orbidity or [m]ortality."

There is simply no objective standard by which the examinations at issue satisfied these requirements for use of CPT code 99214.  As found by the hearing officer, there was insufficient documentation of a detailed history including "past history, family history, and/or social history" across office visits, and Jacobs's examinations were "rote."  Jacobs does not challenge these findings, which are amply supported by the record, on appeal.  In particular, we note the record is replete with examples of insufficient documentation to support that Jacobs conducted any cardiovascular and respiratory examinations and the frequency with which Jacobs billed using CPT code 99214 for the same "rote" examinations oriented around providing prescription refills.

2.  Due process.  Jacobs also argues that his due process rights were violated.  In large part, this argument stems from a limitation that the hearing officer placed on Jacobs's ability

to cross-examine Dr. Siegel.[10]  Jacobs points to two sections of the transcript, one in which he sought to cross-examine Dr. Siegel on the definitions of words used in the CPT manual and another in which he sought to cross-examine Dr. Siegel regarding office visits for which MassHealth agreed that Jacobs correctly billed.

In addressing Jacobs's due process argument, we begin by noting that administrative agencies have wide discretion in ruling on evidence, Rate Setting Comm'n v. Baystate Med. Ctr., 422 Mass. 744, 752 (1996), and the strict rules of evidence do not apply in such proceedings unless otherwise provided by law or unless an agency elects to follow such rules.  See G. L. c. 30A, § 11 (2);[11] Mass. G. Evid. § 1101(c)(3) (2019).  Even if

---

[10] Jacobs also asserts that his due process rights were violated because the hearing officer purportedly showed bias in favor of MassHealth by allowing counsel for MassHealth to pass notes to Dr. Siegel while Dr. Siegel was testifying.  The record does not support this and instead reflects that the hearing officer warned everyone about passing notes as follows:  "So, let me just establish one thing.  Can you stop passing notes, and we will just end that, since it is such a source of consternation.  Let the witness testify.  Same on this side. The witness testifies without coaching."

[11] General Laws c. 30A, § 11 (2), provides as follows: "Unless otherwise provided by any law, agencies need not observe the rules of evidence observed by courts, but shall observe the rules of privilege recognized by law.  Evidence may be admitted and given probative effect only if it is the kind of evidence on which reasonable persons are accustomed to rely in the conduct of serious affairs.  Agencies may exclude unduly repetitious evidence, whether offered on direct examination or cross-examination of witnesses."

the rules of evidence applied, however, we see no abuse of discretion in the limitations that the hearing officer placed on cross-examination here.

Regarding the words used in the CPT manual, as stated by the hearing officer, the matter had been covered "ad nauseam." See Clark v. Clark, 47 Mass. App. Ct. 737, 746 (1999) ("judge has the ability to see that the cross-examination progresses without repetitious and irrelevant inquiries").  Regarding the office visits for which MassHealth agreed that Jacobs correctly billed, Jacobs asserts that he should have been allowed to question Dr. Siegel regarding his opinion as to those office visits "to allow them to be used in contrast to or in comparison with visit notes where [MassHealth] did not agree with the code used."  This argument fails because the hearing officer's limitation was not on this type of comparison but instead with the general nature of Jacobs's questions regarding office visits that were not in dispute.  As the hearing officer explicitly told Jacobs, he could "ask other questions that may be relevant to eliciting that information or offer it on direct" by "offer[ing] a comparison of [the] dates of service."  Especially where Jacobs was given ample opportunity to cross-examine MassHealth's witnesses and present his own case over twenty-eight days of testimony, the two limitations on cross-

examination do not support his argument that his due process rights were violated.

Judgment affirmed.