**YERARDI'S MOODY STREET RESTAURANT & LOUNGE, INC., Plaintiff, Appellant,**

v.

**BOARD OF SELECTMEN OF THE TOWN OF RANDOLPH, Defendant, Appellee.**

No. 90–1876.

United States Court of Appeals, First Circuit.

Heard March 5, 1991.

Decided May 9, 1991.

Rehearing and Rehearing En Banc Denied July 25, 1991.

**90**

Michael W. Reilly, Boston, Mass., with whom Robert D. Ahearn, Milton, Mass., and Pichette, Reilly & Jackson, P.C., Boston, Mass., were on brief, for plaintiff, appellant.

John Foskett, Boston, Mass., with whom Paul R. DeRensis and Deutsch Williams Brooks DeRensis Holland & Drachman, P.C., Nantucket, Mass., were on brief, for defendant, appellee.

Before CYR, Circuit Judge, COFFIN and BOWNES, Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

In this appeal, we are asked to decide whether a town decisionmaking body may be held liable for an equal protection violation if less than a majority of its members possesses bad faith intent. We need not answer the question, however, because we find that any error was harmless since plaintiff's proof of malicious intent to injure was too flimsy to support a rational jury's finding. We therefore affirm.

### I. *Background*

In 1980, Yerardi's Moody Street Restaurant & Lounge, Inc. (Yerardi's) purchased an establishment called Capuchino's, which held a license allowing it to remain open and sell liquor until 2:00 a.m. When Yerardi's sought transfer of the license, the Board of Selectmen of the Town of Randolph (the Board), after some investigation, allowed the transfer but imposed a 1:00 a.m. closing time. Yerardi's sought an extension of the closing time in August 1981 and again in April 1982. The Board denied the request both times without stating its reasons. A quorum of the Board had approved the transfer by a 2–1 vote; the full Board voted 3–2 each time against the extension.

Yerardi's filed suit in Massachusetts Superior Court after the 1982 vote seeking review of the Board's denial of the extension. The superior court granted the Board's motion for summary judgment, concluding that the decision was not arbitrary or capricious. This ruling was reversed by the Massachusetts Appeals Court, which held that the Board should reconsider the application. *See Yerardi's Moody St. Restaurant & Lounge, Inc. v. Board of Selectmen of Randolph*, 19 Mass.App. 296, 473 N.E.2d 1154, 1156–57 (*Yerardi's I*), *further rev. denied*, 394 Mass. 1103, 477 N.E.2d 595 (1985).

After remand but before the Board's decision,[1] Yerardi's filed the instant action in federal district court, claiming violations of various constitutional rights under 42 U.S.C. §§ 1983 and 1985 by three individual selectmen and the Board. The district court dismissed all claims except the § 1983 claim of violation of Yerardi's right to equal protection. After discovery, the defendants moved for summary judgment. That motion was denied without opinion. The decision was appealed, and this court reversed with respect to the individual defendants, finding that they were entitled to qualified immunity. *Yerardi's Moody St. Restaurant & Lounge, Inc. v. Board of Selectmen*, 878 F.2d 16 (1st Cir.1989) (*Yerardi's II*).

A trial ultimately was held on the equal protection claim against the Board. Yerardi's argued that it had been treated differently from others similarly situated in that other establishments had been given 2:00 a.m. closing times while Yerardi's had not, despite the fact that Yerardi's possessed a

---

1. Subsequently, the Board voted to extend Yerardi's license to 2:00 a.m. by a 3–2 vote.

better complaint record than the other establishments. At trial, Yerardi's introduced evidence that all other liquor licenses renewed during the relevant period were renewed at 2:00 a.m. closing times, and that, of the other establishments seeking to transfer a license, one had been given a 2:00 a.m. closing time while the other continued an earlier established 1:00 a.m. closing time, albeit on a mandatory basis. Yerardi's also presented evidence that each of the three selectmen voting against it had been involved in incidents on the premises of Yerardi's or its predecessor, Capuchino's, from which the jury could infer a bad faith or malicious intent to injure Yerardi's.

During deliberations, the jury twice returned questions to the judge about the number of selectmen who needed to possess bad faith intent for the Board to be liable. Yerardi's contended that the appropriate rule was whether the presence of bad faith, regardless of the number of selectmen possessing that intent, changed the outcome of the Board's decision. The judge instructed the jury, however, that the Board only could create policy as a majority and that therefore a majority of the members, three persons, had to have possessed bad faith intent. On these instructions, the jury found that Yerardi's had been treated differently from similarly situated persons, but that the Board did not act with bad faith intent.

Having received this verdict, the judge asked the jury to answer three post-verdict interrogatories. The first queried if any members of the Board had acted with bad faith or malicious intent to injure Yerardi's and, if so, how many. The court also asked the amount of damages that would fairly and reasonably compensate Yerardi's if it had, in fact, suffered constitutional injury. The third question asked if the jury would have awarded prejudgment interest if it had found a violation. The jury responded that two selectmen had possessed improper intent and set damages at $50,000 and prejudgment interest in the amount of 10%.

Judgment was entered for the Board in accordance with the verdict. In its appeal to us, Yerardi's contends that the judge's instruction on bad faith was erroneous, and that the jury should have been told to follow the two-step analysis contained in *Mt. Healthy City School Dist.Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Under that approach, the jury first would determine whether bad faith was a substantial factor motivating the Board's decision. If it found such bad faith, the jury would then need to determine whether the Board proved that its decision would have been the same in the absence of the improper intent. Yerardi's further argues that application of the *Mt. Healthy* standard, in light of the jury's post-verdict interrogatories, entitles it to a directed verdict against the Board.

The Board insists that the district court's instruction was correct. It argues, however, that even if we accept Yerardi's argument, the error was harmless because the evidence of bad faith was insufficient as a matter of law to establish an equal protection violation. Because we agree that the Board was entitled to a directed verdict, we do not reach the question of the appropriate standard for evaluating the Board's intent.[2]

---

**2.** We nevertheless note that Yerardi's claim of error in the instruction is not without substance. In support of the district court's instruction that the Board may be said to act maliciously or in bad faith only if a majority of its members are so motivated, the Board cites *Arroyo Vista Partners v. County of Santa Barbara,* 732 F.Supp. 1046 (C.D.Cal.1990), which dismissed an equal protection claim against a zoning board on the ground that a decision affected by a single board member's improper motivation could not be deemed "policy" for which the board may be held liable. The *Arroyo Vista* court, however, appears to have relied incorrectly on Supreme Court precedent

that a municipality should not generally be held liable for a policymaker's simple failure to probe the basis for actions taken by *non-policymaking* employees. *See id.* at 1056 (citing *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion)). Both in *Arroyo Vista* and here, the acts in question were not those of a subordinate employee but those of a member of the policymaking body. We therefore do not believe *Arroyo Vista* is helpful in this situation.

On the other hand, we see force in Yerardi's suggestion that *Mt. Healthy* provides the best approach for determining when a board decision involving mixed motives reflects municipal

## II. *Discussion*

■ Both parties agree on the applicable standard for liability in this case. As stated by this court in *Yerardi's II:*

> [L]iability in the instant type of equal protection case should depend on proof that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

878 F.2d at 21 (quoting *LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir.1980)). Because there was no allegation of racial, religious or speech discrimination, there must be evidence from which a jury reasonably could find that the Board acted with malicious or bad faith intent to injure Yerardi's.

■ Without question, this court must take the evidence in the light most favorable to Yerardi's and reject the jury's findings only if we conclude that the evidence could lead reasonable persons to a single result. *See, e.g., Computer Systems Engineering, Inc. v. Qantel,* 740 F.2d 59, 65 (1st Cir.1984). We need not, however, "accept unreasonable inferences based on conjecture or speculation." *Santiago–Negron v. Castro–Davila,* 865 F.2d 431, 445 (1st Cir.1989). After careful examination, we find that plaintiff's evidence amounted to nothing more than tenuous insinuation, insufficient to allow a jury to find a denial of Yerardi's equal protection right.

Yerardi's listed in its reply brief the evidence it believed supported a jury's finding of malicious intent to injure it. We shall analyze each piece of evidence in turn.

First, although only three license transfers occurred during the relevant time frame, Yerardi's introduced evidence that of the fourteen licenses regulated by the Board, only the plaintiff's license was "rolled back" to 1:00 a.m. But the Board's actions in allowing automatic renewal of the existing 2:00 a.m. licenses do not shed light on the Board's intent to injure Yerardi's. They may be relevant to whether Yerardi's was treated differently from others similarly situated, but different treatment does not itself prove bad faith intent to injure.[3] *See LeClair,* 627 F.2d at 610–11 (evidence of different treatment is not itself evidence of malice). If that were the case, the two-prong test would collapse on itself, allowing a finding that equal protection rights were violated simply by the showing of different treatment.

Second, Yerardi's presented the affidavit of Henry Lowd, the Executive Secretary of the Board, which was filed with the Massachusetts Superior Court in 1982. That affidavit stated that Lowd believed that, in making its decision, the Board had considered correspondence from Chief Probation Officer Andrew Klein that highlighted community concern about drunk driving. The correspondence from Klein, however, was dated some months after the April 12, 1982 vote of the Board denying Yerardi's second request for an extension. Yerardi's argued that the affidavit therefore tended to show malice by casting doubt on the Board's proffered reasons for its decision; in other words, it suggested that if this explanation for the vote was impossible, the Board's other explanations must be similarly flawed.

But even if Lowd's inaccurate representation about why the Board made a deci-

policy. *Mt. Healthy* itself involved a board decision to fire an employee, and the mixed motive approach set out there has been adopted in other contexts. *See, e.g., Hunter v. Underwood,* 471 U.S. 222, 232, 105 S.Ct. 1916, 1922, 85 L.Ed.2d 222 (1985) (*Mt. Healthy* standard is appropriate standard for evaluating whether statute violates equal protection due to racial motives of legislators); *Village of Arlington Heights v. Metropolitan Housing Dev.Corp.,* 429 U.S. 252, 270–71 n. 21, 97 S.Ct. 555, 566 n. 21, 50 L.Ed.2d 450 (1977) (same); *Springer v. Seamen,* 821 F.2d

871, 878–79 (1st Cir.1987) (standard applied to employment decision based in part on race).

**3.** We are dubious, in fact, whether the treatment of nontransfer licensees was relevant to a finding of different treatment. This court's decision in *Yerardi's II,* 878 F.2d 16, implied that the relevant comparison was with other instances of license transfer between 1980 and 1985. In any event, the evidence clearly was not relevant to prove malice.

sion can be considered a reflection on the rationales provided by the *Board members themselves*, a proposition we question, it provides no *independent* evidence of malice. Instead, it merely casts doubt on the Board's offered rationale without offering evidence of another explanation. Because, as we have said, the jury was not entitled to infer malice from different treatment, see *LeClair*, 627 F.2d at 610–11; *Yerardi's II*, 878 F.2d at 21 (adopting the *LeClair* two-part test), Lowd's affidavit says nothing by itself about the Board's bad faith intent to injure; it may operate only to strengthen very slightly the value of other evidence going directly to malice.

Yerardi's also presented evidence of five events involving the three selectmen who voted against Yerardi's: (1) Selectman Dunn was told she could not park in the restaurant parking lot while it was under the ownership of Capuchino's, resulting in an exchange of words and an employee calling a tow truck; (2) Selectman Connors was denied admittance to the restaurant while it was still operated as Capuchino's, reportedly due to his intoxication; (3) Selectman Semensi brought a bottle of liquor into Yerardi's and had it taken away by the manager; (4) Selectman Connors was refused service at a Christmas party in 1984 due to his intoxicated condition; (5) in the winter of 1987–88, after Yerardi's had closed, Dunn made a comment to a former Yerardi's manager during an encounter in a laundromat that arguably implied unhappiness with the plaintiff. None of these items, however, provides adequate evidence of malice to support a jury's finding.

Three of the incidents, having occurred after the initial votes against Yerardi's, provide no evidence about the intent of the selectmen at the time their votes were made. The fact that Connors was refused service in December 1984 is clearly irrelevant to his intent in voting against Yerardi's in both 1981 and 1982. Similarly, Dunn's comment in 1987–88, whatever it dubiously implies about her happiness with

Yerardi's after the suit was filed, is not evidence of a bad faith motive to injure the restaurant at the time of the votes. Finally, the incident in which Semensi had a bottle taken from him at Yerardi's indisputably occurred after the first time he had voted to deny the extension.[4] These incidents therefore are not relevant to show malice in the Board's decision. *See LeClair*, 627 F.2d at 611 (unusually rigorous reinspection after suit filed is not relevant to motive when original action taken).

The remaining two incidents occurred when the restaurant was known as Capuchino's. Both incidents involved confrontations with an employee of Capuchino's who was retained in the same capacity by Yerardi's. The Board argues that this evidence is not relevant to prove improper malice toward Yerardi's, and cites *LeClair*, 627 F.2d at 611. The *LeClair* court held that evidence that an inspector was angry with another farmer visited immediately before the plaintiff farmers did not tend to prove that the inspector harbored any malice toward the *plaintiffs*. Here, however, Yerardi's points to two incidents involving an individual employed by the prior owner of the premises who continued to be employed by Yerardi's. There was evidence that the employee was present at the initial meeting to transfer the liquor license to Yerardi's and was recognized by Dunn. Unlike in *LeClair*, this evidence is not merely evidence of a general bad mood. It potentially suggests a desire to harm the successor establishment.

But the fact that these events occurred under different ownership weakens substantially the probative value of the evidence. While we cannot say that the evidence is totally irrelevant, we note that it constitutes the sole ephemeral support for the finding of bad faith intent to injure Yerardi's. And we conclude that such evidence is simply not enough. The inference Yerardi's asks us to draw—that the Board intended to harm Yerardi's solely because it employed an individual who was involved

---

**4.** The testimony reveals that the witness, Ms. DeLorey, only knew who Semensi was from attendance at meetings involving the 2:00 a.m. liquor license.

Q. How did you know who [Semensi] was?

A. Because I had gone to Selectmen meetings every time we went up to try to get the two o'clock license back. *I recognized him from there.*

Appendix at 270 (emphasis added).

in minor incidents while working for a prior restaurant—is unreasonably speculative. *See Santiago–Negron*, 865 F.2d at 445.

We note that, as a general matter, the equal protection clause serves to protect suspect classes and fundamental interests from inequitable treatment. *LeClair*, 627 F.2d at 611. *See also Cleburne v. Cleburne Living Center*, 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). A party may prove that it has been singled out for different treatment in violation of the equal protection clause in the absence of some invidious classification or abuse of a fundamental right by showing, in addition to different treatment, evidence of bad faith or malicious intent to injure. *See Yerardi's II*, 878 F.2d at 21 (adopting *LeClair* standard). But we have indicated that such cases are infrequent. *See PFZ Properties, Inc. v. Rene Alberto Rodriguez*, 928 F.2d 28, 33 (1st Cir.1991) (" 'Every appeal ... from an adverse ruling ... necessarily involves some claim that the board exceeded, abused or "distorted" its legal authority in some manner, often for some allegedly perverse ... reason. It is not enough simply to give these state law claims constitutional labels such as "due process" or "equal protection" in order to raise a substantial federal question under section 1983.' ") (quoting *Creative Environments, Inc. v. Estabrook*, 680 F.2d 822, 833 (1st Cir.1982)).

In such a case, we must insist on more than the gossamer proofs offered here before a jury will be entitled to find a bad faith intent to injure in violation of the equal protection clause. "[W]here no invidious discrimination or interference with the exercise of other express constitutional rights has occurred, the malice/bad faith standard should be scrupulously met." *LeClair*, 627 F.2d at 611. The Board therefore was entitled to a directed verdict on this claim and any error in instruction consequently was harmless.[5]

*Affirmed.*

---

**5.** In light of our disposition, we do not address the Board's various evidentiary challenges.