### John TRAFFORD d/b/a Reservoir Estates

v.

**Benjamin PENNO, in his official capacity as a Member of the Coventry Planning Commission and Individually, Marcel Valois, Raymond Monahan, Iganazio J. Fontana, Kevin McGee, Barbara D'Amato, Frank C. Messina, Brian Bamford, Richard Palazzo, and Charles La-Pointe, in their official capacity as members of the Coventry Planning Commission, and James Kiley, Raymond Byrnes, Ernest Legault, Edward Carley, and James Spearman, in their official capacity as Members of the Coventry Town Council, and Barry Yeaw, in his official capacity as Finance Director, Raquel E. Storti, in her official capacity, and John Assalone, Jr., and Robert Forcier, Individually.**

Civ. A. No. 90–465B.

United States District Court, D. Rhode Island.

Sept. 14, 1992.

**1054**

Arlene Marie Violet, Arlene Violet & Law Assoc., Barrington, R.I., Ina P. Schiff, Providence, R.I., for plaintiff.

Paul Kevin Sprague, Robinson & Sprague, Warwick, R.I., Charles T. Rennick, Jr., Coventry, R.I., for Penno, et al.

Richard P. Sullivan, Lenihan, Moone, Gallogly, Comolli & Grady, Westerly, R.I., for Penno, Storti, Assalone, Forcier et al.

Arnold N. Montaquila, Arnold N. Montaquila, Ltd., Providence, R.I., for Assalone, Forcier.

Scott J. Summer, Arnold N. Montaquila, Ltd., Providence, R.I., for Forcier.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

This case presents the tale of a disgruntled developer, seeking an unknown quantity in damages for a short delay in pre-application approval of a subdivision plan by the Coventry Planning Commission ("Commission"). Plaintiff, John T. Trafford, claims pursuant to 42 U.S.C. § 1983 a denial of his rights under the equal protection clause of the fourteenth amendment, resulting from an alleged conspiracy to deny Plaintiff a fair hearing before the Commission between Defendant Benjamin Penno, the Chairman of the Commission, and Defendants John Assalone, Jr. and Robert Forcier, both developers in the town of Coventry.

Trafford is a resident and real estate developer in the town of Coventry. Trafford initially filed an application for pre-application approval of subdivision plans for the property in question, Reservoir Estates, in 1986. The 1986 site plan contained a 1,100 foot dead-end road named "Catalpa Way." At that time, the Commission refused to consider the application officially until Trafford conducted a water service study to determine if the project would adversely affect existing water service. Plaintiff failed to conduct the requisite water study.

Instead, Plaintiff divided off and installed water lines on four frontage lots on Reservoir Road. After subdividing these frontage lots, Plaintiff filed a new pre-application submission for the remainder of the property on December 13, 1989. The proposed subdivision contained the same 1,100 foot road that was present in the 1986 site plan.

The Commission scheduled a hearing on the pre-application submission for Reservoir Estates on December 27, 1989. The Secretary for the Commission and the town planner, with no input from the members of the Commission, placed Reservoir Estates last on the agenda for the December 27, 1989 hearing because the submission was deemed "new business," which is always placed at the end of an agenda. Contrary to the customary practice of hearing petitions until 11 P.M., the Commission adjourned the December 27, 1989 meeting at 10:57 P.M., before it had an opportunity to hear Plaintiff's application. The Commission rescheduled Plaintiff's hearing for January 31, 1990.

To Plaintiff's misfortune, on January 8, 1990, the Town Council of the Town of Coventry declared a building moratorium, which in part ordered the Commission not to accept any new proposals for subdivi-

sions, but to proceed with proposals that had already received pre-application approval. The moratorium was to expire on November 1, 1990.

On January 10, 1990, the Commission informed Plaintiff that his pre-application submission would not be processed because of the moratorium and returned Plaintiff's $400 filing fee. Plaintiff's attorney thereafter appeared before a February 12, 1990 meeting of the Town Council to persuade the Council that the moratorium should not apply to pending petitions which had been docketed, but not yet heard, for pre-application approval. The Town Council agreed and at its February 27, 1990 meeting, it passed a motion to prepare and send a letter to the Commission directing the Commission to give Plaintiff an opportunity to be heard, even though the subdivision had not yet received pre-application approval.

At a March 28, 1990 meeting, the Commission heard Plaintiff's pre-application for the first time. During this meeting, the 1,100 foot length of Catalpa Way was discussed. The Commission noted that the proposed 1,100 foot dead-end road would violate a subdivision regulation prohibiting dead-end streets over 600 feet in length. Because of the length of Catalpa Way, two means of ingress and egress would be necessary. Plaintiff's engineer suggested that the ingress/egress problem could be avoided if Catalpa Way tied in with roads in Wood Estates North, an abutting property that was being developed by Defendants Forcier and Assalone. After the meeting, Plaintiff's attorney contacted Defendant Forcier to suggest that they consider joining roads in the two developments. After speaking with his partners, Forcier informed Plaintiff's attorney that the portion of Wood Estates North that actually abutted Reservoir Estates would not be developed for years and that Wood Estates North did not want to be tied in with any requirements that were being placed on Reservoir Estates as that might throw off the time schedule for Wood Estates North.

Since connection with Wood Estates North was no longer an immediate option, Plaintiff began considering new solutions to the ingress/egress problem. At an April 11, 1990 work session attended by Plaintiff, his engineer, the Town Planner, the Planning Commission Secretary, and various members of the Planning Commission, Plaintiff presented a revised map, dated April 11, 1990, showing a temporary cul-de-sac. The revised map was merely a duplication of the original plan with lines drawn over the original map to show the temporary cul-de-sac. At the work session, Plaintiff proposed to develop Reservoir Estates in two phases: the first phase would contain seven lots and a temporary cul-de-sac; and the second phase would contain seven more lots, which would be left undeveloped until Wood Estates North was available for a road connection with Catalpa Way.

Plaintiff contends that the town representatives told him that they would take this plan under advisement and vote on it at the next Planning Commission meeting, but that nobody told Plaintiff that the revised plan containing a temporary cul-de-sac would require a new pre-application submission and a new filing fee. At trial, however, both the Secretary of the Commission and Town Planner testified that a new pre-application submission is always required for a major modification such as a change in road length. Moreover, the Secretary testified that Plaintiff never left copies of the revised plan with Commission members or staff after the work session.

At the next full meeting of the Planning Commission on May 16, 1990, Plaintiff's pre-application was heard once again. During the course of this meeting, Plaintiff's attorney described his unsuccessful efforts to persuade Defendant Forcier to alter the time schedule of Wood Estates North so that Wood Estates North would be available for a road connection with Catalpa Way. Plaintiff's attorney then presented the revised map showing the temporary cul-de-sac. The Commission Secretary informed the Commission that Plaintiff had never formally submitted the revised plan. A Planning Commission member thereafter moved to deny Plaintiff's application because it did not contain a second means of ingress and egress. In order to break a

three-to-three tied vote, Chairman Penno voted to deny Plaintiff's application.

Plaintiff appealed this decision to the Coventry Zoning Board of Review. Because the Zoning Board of Review was confused as to whether the Commission denied the original plan containing a 1,100 foot dead-end road or the revised plan containing a temporary cul-de-sac, it remanded Plaintiff's appeal to the Commission for clarification as to which plan had been denied.

On July 25, 1990, the Commission heard the remand and determined that it had denied the original plan containing a 1,100 foot dead-end road. Plaintiff did not appeal this decision to the Zoning Board of Review. Instead, Plaintiff filed suit against the Town of Coventry on August 20, 1990, demanding $1.5 million in damages.[1] On September 14, 1990, Plaintiff filed the present lawsuit, asking the Court to order the Commission to approve the subdivision and seeking compensatory and punitive damages.

In addition to filing several lawsuits, Plaintiff also filed an ethics complaint against Chairman Penno. Penno was a parttime salesman for a mobile home park in which he lived, Westwood Estates, and which was owned by Defendant Assalone. Penno's annual income from commissions on these sales since 1985 ranged from $1,400 to $9,200. According to Penno, he and Assalone had a mutual understanding that they would not discuss Assalone's development projects or other matters under consideration by the Planning Commission. Although Penno occasionally participated in Commission discussions of Assalone's or Forcier's projects, it is unclear whether Penno abstained from voting on all of Assalone's projects. Penno, however, denied discussing Plaintiff's development, Reservoir Estates, with either Assalone or Forcier.

Both Forcier and Assalone, however, had expressed an interest in purchasing Reservoir Estates from Plaintiff. Assalone at one time offered to purchase the property for $225,000, which Plaintiff rejected because an outstanding balance of $250,000 remained on the mortgage. On several other occasions, Assalone offered to purchase the property if Plaintiff received the requisite water approvals.

Forcier had also expressed an interest in Reservoir Estates. In 1986, Forcier proposed an agreement between Plaintiff, Forcier, and a third partner, Mr. Beaudoin, in which Forcier and Beaudoin would pay engineering expenses incurred in the process of obtaining the requisite approvals, while Plaintiff would make downpayment and mortgage payments on the property. Each partner would receive a one-third interest in any profits. However, if Forcier and Beaudoin failed to obtain Commission approval, they would lose their interest in the property. According to Plaintiff, Beaudoin bragged that Forcier had connections with the Commission and could get approvals quickly. Plaintiff rejected the proposal.

Sometime in 1988, Forcier discussed purchasing Reservoir Estates after Plaintiff got approvals or purchasing an easement through Reservoir Estates in order to run water lines to Wood Estates North. Plaintiff claims that Forcier subsequently threatened on several occasions to put Plaintiff out of business if Plaintiff did not cooperate in reaching an agreement with Forcier. According to Plaintiff, Forcier told Plaintiff that if Plaintiff didn't put Forcier's name of the Reservoir Estates project, that Plaintiff would not be able to get the project through the Planning Commission.

These threats, if indeed they occurred, later proved to be unheeded and unfounded. On November 7, 1990, one week after the town's moratorium expired, Plaintiff filed a new pre-application submission for a nine-lot subdivision with a 600 foot cul-de-sac containing a permanent turn-around. On January 9, 1991, the Commission granted preliminary approval for the new plan. At this time, however, Plaintiff had still failed to receive the requisite water approvals from the Kent County Water Authority. In fact, as late as April 19, 1991, the Chief

---

**1.** It is unclear what became of the lawsuit filed in August.

Engineer for the Kent County Water Authority wrote to Plaintiff's engineers informing them that the Water Authority would be unable to service Reservoir Estates due to its high elevations.

### Discussion

Plaintiff contends that Defendants conspired to deprive Plaintiff of his fourteenth amendment right to equal protection in contravention of § 1983. Specifically, Plaintiff alleges that Defendant Penno conspired with Defendants Forcier and Assalone to deprive Plaintiff of his right to a fair hearing before the Planning Commission and to pervert the planning review process to benefit the Defendants.

■ Allegations of conspiracy, however, do not relieve Plaintiff of the obligation to prove an actual deprivation of Plaintiff's right to equal protection. Conspiracy is merely a method of obtaining the necessary state action or imposing liability on one defendant for acts performed by other defendants in furtherance of the conspiracy. *Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir.1980). Thus, in order to prevail under § 1983 on his claim of conspiracy, " 'plaintiff must allege and prove both a conspiracy and an actual deprivation of rights; mere proof of conspiracy is insufficient to establish a section 1983 claim.' " *Id.* (quoting *Hampton v. Hanrahan*, 600 F.2d 600, 622 (7th Cir.1979), *rev'd in part on other grounds*, 446 U.S. 754, 100 S.Ct. 1987, ·64 L.Ed.2d 670 (1980)).

■ Proving an actual deprivation of equal protection rights in a dispute between a developer and a town planning agency is a daunting task. First, Plaintiff must prove that he was actually treated differently than other developers similarly situated. Absent proof of differing treatment, an equal protection claim must fail. *Nestor Colon Medina & Sucesores, Inc. v. Custidio*, 964 F.2d 32, 44 (1st Cir.1992); *Yeradi's Moody St. Rest. & Lounge, Inc. v. Board of Selectmen (Yeradi's I)*, 878 F.2d 16, 21 (1st Cir.1989).

■ Proof of differing treatment alone, however, does not end the equal protection

inquiry. The Court of Appeals for the First Circuit has made it abundantly clear that a federal court should not sit as a super zoning board of appeals. *E.g., Raskiewicz v. Town of New Boston*, 754 F.2d 38, 44 (1st Cir.), *cert. denied*, 474 U.S. 845, 106 S.Ct. 135, 88 L.Ed.2d 111 (1985); *Creative Environments, Inc. v. Estabrook*, 680 F.2d 822, 833 (1st Cir.), *cert. denied*, 459 U.S. 989, 103 S.Ct. 345, 74 L.Ed.2d 385 (1982). Thus, departures from administrative policies or procedures or the denial of a permit based on illegitimate reasons ordinarily will not amount to a violation of a developer's constitutional right to equal protection. *PFZ Properties, Inc. v. Rodriguez*, 928 F.2d 28, 32 (1st Cir.1991), *cert. dismissed*, —— U.S. ——, 112 S.Ct. 1151, 117 L.Ed.2d 400 (1992). Otherwise, "disgruntled permit applicants could create constitutional claims merely by alleging that they were treated differently" from similarly situated applicants. *Nestor Colon*, 964 F.2d at 44–45.

■ Therefore, in order to establish an equal protection claim, a plaintiff must also prove either invidious discrimination based on classifications such as race or sex, egregious abuse of power or fundamentally unfair procedures. *See Nestor Colon*, 964 F.2d at 44; *PFZ Properties*, 928 F.2d at 32; *Creative Environments*, 680 F.2d at 832 n. 9. The threshold for establishing an "egregious abuse of power" is a high one. *Nestor Colon*, 964 F.2d at 44–45 ("We have left the door slightly ajar for federal relief in truly horrendous situations."). Amorphous allegations of bias, bad faith, malice, conspiracy and corruption will not suffice to pass this threshold. *Raskiewicz*, 754 F.2d at 44. Instead, a plaintiff must allege and prove something more akin to actual corruption, *Id.; Carter v. Rollins Cablevision of Massachusetts, Inc.*, 618 F.Supp. 425, 430 (D.Mass.1985), or bad faith intent to injure based on personal hostility, *Yeradi's Moody St. Rest. & Lounge, Inc. v. Board of Selectmen (Yeradi's II)*, 932 F.2d 89, 94 (1st Cir.1991); *Yeradi's I*, 878 F.2d at 21.

. In the present case, Plaintiff alleges that he has been treated differently from other

similarly situated developers in the following respects: 1) the placement of Plaintiff's application last on the agenda for the December 27, 1989 meeting of the Planning Commission; 2) the adjournment of the December 27, 1989 meeting three minutes prior to the normal 11 P.M. curfew; 3) the refusal of the Commission to consider Plaintiff's revised plan showing a temporary cul-de-sac until Plaintiff filed a new pre-application submission; and 4) the denial of Plaintiff's application because it did not contain two means of ingress and egress.

■ With respect to most of Plaintiff's bald assertions, there is simply no evidence that Plaintiff was treated any differently from similarly situated developers. Plaintiff attempted at trial to establish that there was a conspiracy to place Reservoir Estates last on the agenda for the December 27, 1989 Commission meeting. However, Plaintiff failed to introduce any evidence suggesting that another similarly situated developer would have been placed earlier on the agenda. In fact, the only evidence on this issue came from the Secretary of the Commission, who testified that Plaintiff's position on the agenda was the product of his submission being deemed "new business," which is always at the end of the agenda. Moreover, the Secretary testified that the agenda is prepared by the Secretary and the Town Planner with no input from members of the Planning Commission. Thus, Plaintiff failed to even establish a connection between the Defendants and Reservoir Estate's placement on the agenda.

Plaintiff also failed to prove that he was treated any differently from other similarly situated developers by the Commission's refusal to consider his revised subdivision plan showing a temporary cul-de-sac until Plaintiff filed a new pre-application. Both the Secretary and the Town Planner testified that all developers are required to refile revised plans at the pre-application phase and pay an additional $400 filing fee if a revised plan contains major modifications. The Town Planner further testified that a modification of road length is severe

enough to necessitate a new submission. Plaintiff failed to introduce any evidence that the Commission did not require new submissions from other developers who revised road lengths. At trial, Plaintiff pointed to two of his earlier developments, Tiffany Estates and Goff Estates, in which modifications were made at the pre-application stage and new pre-application submissions were not required. Plaintiff, however, did not suggest that the modifications on the earlier projects involved changes in road lengths.

Plaintiff next complains that the Commission's denial of pre-application approval for Reservoir Estates on May 16, 1990 differed from its treatment of other similarly situated developments that did not contain two means of ingress and egress. Although a Planning Commission member did testify that the Commission occasionally approved developments with only one means of ingress and egress, these other developments differed in material respects from Reservoir Estates. For example, one development that was approved by the Commission even though it contained a dead-end road over 600 feet lies partially within the neighboring town of Scituate. Another development with only one egress—a loop road with two dead-ends off it—was so old that the town no longer had files on it. Moreover, Plaintiff produced no evidence that Chairman Penno voted inconsistently on the ingress/egress policy. *See Yeradi's I,* 878 F.2d at 21 ("A consistently held position consistently applied to all license applicants can not show selective treatment."). Thus, Plaintiff failed to prove that the Commission or, more importantly, Chairman Penno, treated *similarly situated* developers differently by granting pre-application approval to several developments with only one means of ingress and egress.

■ This leaves only the adjournment of the December 27, 1989 meeting three minutes before the usual 11 P.M. curfew. It is questionable whether the adjournment of a meeting three minutes early could ever constitute the type of "egregious abuse of power" necessary for an equal protection

claim in the context of a permit dispute. However, even if the ever-so-slightly early adjournment could be considered a "truly horrendous situation," Plaintiff's equal protection claim would still fail because Plaintiff failed to prove the existence of actual corruption or bad faith intent to injure. *See Nestor Colon,* 964 F.2d at 44–45. Indeed, absent proof of actual corruption or bad faith intent to injure, even if Plaintiff had proven selective treatment in the denial of his pre-application approval, there would still be no equal protection violation.[2]

Plaintiff's attempt to establish the requisite actual corruption or bad faith intent to injure essentially boils down to the following unsupported conjecture: Defendants Assalone and Forcier wanted to purchase an interest in Reservoir Estates and used their influence over Chairman Penno, a parttime salesman for one of Defendant Assalone's developments, in order to delay Commission approval of Reservoir Estates so that Assalone and Forcier could purchase the property at a reduced price. To support this wildly speculative assertion, Plaintiff points to the allegedly improper participation of Chairman Penno in Commission discussions of projects being developed by Assalone or Forcier. Although Chairman Penno's participation in these discussions may have been inappropriate due to his business relationship with Assalone, this potential impropriety does not support an inference of actual corruption or bad faith intent to injure on the part of Chairman Penno by later participating in Commission discussions of Reservoir Estates.

Plaintiff next points to attempts by Forcier and Assalone to purchase interests in Reservoir Estates and an alleged statement made by a business associate of Forcier that Forcier had connections with the Commission and could get approvals quickly. This statement, however, is more indicative of puffery in an attempt to close a good deal than it is of actual corruption by Chairman Penno's later participation in Commission deliberations of Reservoir Es-

tates. Plaintiff also alleges that Forcier threatened to put Plaintiff out of business if Plaintiff did not transfer an interest in Reservoir Estates to Forcier. This Court finds these threats to be somewhat incredible in light of the fact that Plaintiff subsequently permitted his attorney to request Forcier to allow Catalpa Way to tie in with roads in Wood Estates North. Why would Plaintiff think that Forcier, who had allegedly threatened to bankrupt Plaintiff, would voluntarily alter the phasing of Wood Estates North in order to suit Plaintiff's needs? The more likely scenario is that these threats never occurred. However, even if these threats had occurred, there is no evidence implicating Chairman Penno in any conspiracy. Penno testified that he never discussed Reservoir Estates with either Assalone or Forcier.

Rather than actual corruption and bad faith intent to injure, the evidence at trial suggests that Chairman Penno acted only with good faith in order to satisfy his duties as Chairman of the Coventry Planning Commission. For example, at the May 16, 1990 Commission meeting, several members of the Commission expressed the opinion that although Plaintiff's plan could be heard that evening that no action should be taken on the plan until the Town of Coventry completed its comprehensive plan. Chairman Penno, rather than opting to delay the process, afforded Plaintiff a hearing stating:

> I'm going to proceed with the hearing unless I have an adverse opinion from somebody on the Board that objects strenuously. I'm under mixed emotions about it, but without the Solicitor here to make a recommendation, I'm going to have to make a judgment call on my own. I believe in fairness to Mr. Trafford, we as a Board should proceed with the application....

Later on that evening, in order to break a three-to-three tied vote on Reservoir Estates, Chairman Penno voted to deny the pre-application because "it does not con-

---

**2.** Plaintiff has not alleged either invidious discrimination based on classifications such as race or fundamentally unfair procedures. *See*

*PFZ Properties,* 928 F.2d at 32. Thus, Plaintiff's case must rise or fall on the existence of an "egregious abuse of power." *See id.*

form with the Subdivision Regulations and the fact that it doesn't have two entrances to it and there are problems with the water situation...." Such statements hardly indicate corruption or bad faith; instead, they indicate good faith exercise of his duties as Chairman of the Commission. Thus, Plaintiff has failed to prove an "egregious abuse of power" necessary for an equal protection violation in this case.

 However, even if Plaintiff had established an equal protection violation, Plaintiff still failed to prove any damages from Defendants' conduct. It is well-settled that "[a] party's financial loss is the ultimate measure of damages ... and the purpose of a damage award is to compensate the injured party for loss resulting from conduct of the wrongdoer, 'not to penalize the wrongdoer or to allow plaintiff to recover a windfall.'" *Cordeco Development Corp. v. Santiago Vasquez,* 539 F.2d 256, 262 (1st Cir.), *cert. denied,* 429 U.S. 978, 97 S.Ct. 488, 50 L.Ed.2d 586 (1976) (quoting *Farmers and Bankers Life Ins. Co. v. St. Regis Paper Co.,* 456 F.2d 347, 351 (5th Cir.1972)). General allegations of damage are insufficient to prove loss resulting from an equal protection violation. As the First Circuit stated in *Cordeco,* "with respect to the amount of damages, while the plaintiff need not demonstrate the amount of damages with mathematical precision, ... it must provide sufficient evidence to take the amount of damages out of the realm of speculation and conjecture." *Id.* (citations omitted).

Plaintiff testified that the delay resulted in increased engineering, survey, site and interest costs. Notwithstanding this testimony, Plaintiff failed to provide any evidence of damages that meets the test set forth in *Cordeco. Id.* There was no evidence of loss of profits, costs, or fees, nor was there any evidence as to the amount of interest paid on the mortgage during the period of the delay.

Moreover, any damages in delays encountered by Plaintiff were caused by Plaintiff's failure to adequately deal with water pressure problems on Reservoir Estates, rather than from alleged misconduct on the part of the Defendants. Plaintiff failed to conduct the water service study requested by the Commission in 1986. Furthermore, even after Plaintiff obtained preapplication approval in 1991, he had still failed to satisfy the requirements of Kent County Water Authority. By letter dated April 19, 1991, the General Manager/Chief Engineer of the Kent County Water Authority wrote to Plaintiff's engineers, stating that "[b]ecause of the elevations of [Reservoir Estates], Kent County Water Authority will be unable to service this development at the present time." As such, not only has Plaintiff failed to prove damages, he has also failed to establish a causal connection between the Defendants' conduct and the alleged delay.

In conclusion, Plaintiff has failed to prove an actual deprivation of his right to equal protection under 42 U.S.C. § 1983. Plaintiff failed to establish both that he was treated differently from other similarly situated developers and that Chairman Penno's conduct constituted an "egregious abuse of power." Moreover, even if Plaintiff had established an equal protection violation, Plaintiff would not be entitled to damages because Plaintiff failed to produce any evidence regarding the actual amount of damages and Plaintiff failed to prove that Defendants' conduct, rather than Plaintiff's inability to obtain approval from the Kent County Water Authority, caused the alleged damages.

Accordingly, judgment shall enter for the Defendants.

SO ORDERED.