PROVIDENCE TEACHERS' UNION
LOCAL 958, AFL–CIO, AFT et
al.

v.

The CITY COUNCIL OF the CITY
OF PROVIDENCE et al.

No. 2003–541–Appeal.

Supreme Court of Rhode Island.

Dec. 21, 2005.

Christopher D. DiSano, Esq., Providence, for Plaintiff.

Caroline Cornwell, Esq., for Defendant.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Justice SUTTELL, for the Court.

In 1999, the Providence Teachers' Union and five teachers filed a complaint challenging the application of § 1210 of the Providence Home Rule Charter of 1980 (the charter) requiring that all Providence municipal employees, including those of the Providence School Department, reside within the city limits of Providence. The five individual teachers sought the equitable relief of reinstatement to their former positions as teachers in the Providence public school system. After a hearing on the plaintiffs' request for preliminary and permanent injunction, the trial justice rejected their claim that the residency provision had been selectively enforced against them and entered judgment for the defendants.[1] One teacher, Oscar Tassone (plaintiff), has appealed from such judgment.

On appeal, plaintiff contends that defendants violated the equal protection guarantees of section 1 of the Fourteenth Amendment to the United States Constitution and article 1, section 2, of the Rhode Island Constitution. Specifically, plaintiff argues that defendants selectively enforced the residency requirement of § 1210 of the charter since the time of the provision's effective date of January 1, 1993. For the reasons set forth herein, we affirm the judgment of the Superior Court.[2]

### Facts and Procedural History

The school board hired Mr. Tassone as a substitute teacher in 1996. Before his Providence appointment, plaintiff taught in Pawtucket for twenty-three years, but had never held a position as a Providence municipal employee. The plaintiff resided in Pawtucket during the relevant portions of his teaching career in the Providence public school system. In 1998, the school board elevated plaintiff to the status of regular full-time teacher. Later that school year, in a letter dated February 9, 1999, Interim Superintendent Robert A. DeRobbio, Ph.D. (Superintendent DeRobbio), notified plaintiff that the school board would entertain a resolution on February 22, 1999, terminating plaintiff's employment. Superintendent DeRobbio explained that the charter required the school board to act due to plaintiff's failure to satisfy the residency requirement of § 1210. Thereafter, on February 22, 1999, the school board passed Resolution No. 92, authorizing the nonrenewal of plaintiff's

1. The defendants are the City Council of the City of Providence and its then members and the Providence School Board (the school board).

2. In his brief, Mr. Tassone requests that this Court reverse the judgment of the Superior Court, reinstate him to his former teaching position, and grant him back pay, benefits, and tenured status within the Providence school system. The trial justice, however, expressly limited his decision to plaintiffs' request for injunctive relief. Therefore, any issue relating to damages, if still viable, is not properly before this Court.

teaching contract for the 1999–2000 school year, as well as the contracts of other teachers who did not satisfy § 1210. Superintendent DeRobbio notified plaintiff of the passage of Resolution No. 92 in a letter dated February 23, 1999.

The charter's residency provision, § 1210, has an extensive history in Providence. Effective January 3, 1983, § 1210 required all Providence municipal employees to reside in Providence during their employment. *Providence Teachers Union v. Napolitano*, 690 A.2d 855, 855 (R.I. 1997). The express language of the provision included employees of the school department within the capture of § 1210. *Providence Teachers Union*, 690 A.2d at 855. In November 1990, however, the electors of Providence voted to approve an amendment removing the residency requirement for most of the employees to whom § 1210 applied, including certified schoolteachers. *Providence Teachers Union*, 690 A.2d at 855. Then, two years later, the city council passed a resolution to further amend the charter to reinstitute the residency requirement for all new city workers employed after January 1, 1993.[3] *Id.* Approved by the voters on November 3, 1992, this most recently amended version of § 1210 provides:

> "All officers of the city as defined in section 1207, and all employees of the city and of any and all agencies and instrumentalities thereof, including all employees of the school department and the department of public safety, shall be residents of the city during such employment; provided, however, that any person employed by the city on the date upon which this provision takes effect shall not be subject to the foregoing provision. Persons not residents of the city may be appointed or engaged for employment on the condition that within six (6) months of such appointment or engagement they shall become residents of the city. Residence shall be defined for purposes of this section as being domiciled in the City of Providence according to the definition of domicile set forth in section 206. Any officer or employee of the city who, during employment, ceases to be a resident shall forfeit his or her position in the employ of the city. It shall be the duty of the director of personnel to monitor this residency requirement on a timely basis and report any violations to the mayor and city council for appropriate action. Upon certification by the mayor that after diligent search no person with proper qualifications can be found to fill a particular position among residents of the city, the city council may exempt a nonresident employee from the provisions of this section." Providence Home Rule Charter 1980, § 1210 (Reprint Oct. 2002).

An important consequence of the 1992 amendment to § 1210 concerned the applicability of the residency requirement to a segment of school department employees based upon their dates of hire. Colloquially referred to by school administrators as "grandfathering," a teacher hired before the new effective date of § 1210 would be free to live outside the city limits for the duration of employment without repercussion. The language of § 1210 itself provided the authority behind grandfathering by explicitly stating "that any person employed by the city on the date upon which

---

3. In 2000, the General Assembly amended G.L.1956 § 16–12–9 to say in pertinent part: "[a]ny prior ratification and validation by the general assembly of a home rule charter provision requiring residency within a city or town as a condition for employment of a public school teacher or school district administrator is hereby expressly repealed by the general assembly." P.L.2000, ch. 55, art. 20, § 5.

this provision takes effect shall not be subject to the foregoing provision." [4] A nonresident teacher's appointment on or after January 1, 1993, however, was conditioned upon a showing of Providence residency within six months from date of hire. *Id.* Should a non-grandfathered teacher fail to establish residency in Providence within the given time, § 1210 required that the school board terminate that teacher's contract. Although the school board traditionally notified non-grandfathered teachers of their non-renewals before March 1, it allowed teachers in violation of § 1210 to stay on for the remainder of the school year "[f]or the benefit of the children."

Whether the school board would confer grandfather status upon a particular teacher depended not only on the date of hire, but also on a given teacher's position. In the Providence public school system, teachers either are regular teachers or substitutes. The former category consists of tenured teachers and those full-time teachers scheduled to reach tenure within three years, called probationary teachers. Tradition or convenience divides substitute teachers into three subcategories, depending upon manner of hire, duties, and pay schedules. The lowest ranking in terms of hierarchy, a per-diem substitute is a teacher hired on a day-by-day basis to fill a vacancy left by a regular teacher. Per-diem substitutes are nonunion employees without any express contractual benefits who are paid a set stipend for each day hired. Next, long-term-substitutes-in-pool are teachers that the school board hires yearly by resolution to fill in for absent regular teachers on a day-by-day basis. Unlike per-diem substitutes, these substitutes receive contractual benefits and are paid in accordance with a pay schedule determined by the number of years teaching, degrees, and other special skills. Last, long-term-substitutes are identical to long-term-substitutes-in-pool, but fill vacancies for regular teachers who are absent for a full semester or the remainder of the school year. Of the teacher categories and subcategories described above, only tenured teachers possess teaching contracts that span the course of their employment. The school board each year must renew the contracts of probationary teachers and the two subcategories of long-term substitutes, although this is largely a formality absent bad conduct. School administrators hire per-diem substitutes, however, only on a daily basis.

For all periods relevant to this appeal, the school board enforced § 1210 against tenured and probationary teachers hired on or after January 1, 1993, but declined to do so against any subcategory of substitute. This permitted substitute teachers to live outside Providence during the course of their employment. The school board also maintained an unwritten policy under which it conferred grandfather status upon substitutes hired before January 1, 1993. The purpose behind this unwritten policy was to benefit those few *nonresident* teachers who, hired as substitutes before 1993, the school board would elevate to regular status in the years to come. The benefit manifested itself in the school board's nonapplication of § 1210's residency requirement on that subset of teachers. By the same rationale, the school board permitted *resident* teachers with the same pre–1993 substituting experience, and who later became regular teachers, to relocate outside of Providence at any time during

---

4. This Court has addressed a similar issue concerning the grandfather clause of § 1210, but in the provision's pre-amended form. *See*

*Providence Teachers Union Local No. 958 v. Napolitano,* 554 A.2d 641, 642 (R.I.1989).

the course of their employment.[5]

Mr. Tassone brought suit on November 19, 1999, together with the Providence Teachers' Union and four other teacher-complainants whom the school board had terminated for failure to meet the residency requirement of § 1210. The plaintiffs sought a preliminary and permanent injunction reinstating the five individual teachers to their former positions as well as monetary damages associated with their termination.[6] The Superior Court held a nonjury trial on various days from October 2001 through March 2002 for the specific purpose of addressing plaintiffs' equitable claims, reserving the issue of damages for a later time.[7] In a bench decision dated July 25, 2002, the trial justice denied plaintiffs' request for a preliminary and permanent injunction, reasoning that no injunction would be issued because plaintiffs had failed to establish two necessary elements of their claim that the school board selectively had enforced the residency requirement in violation of federal and state constitutional guarantees of equal protection: (1) that plaintiffs were part of the particular class of persons against whom the school board had discriminately enforced

§ 1210; and (2) that the school board had acted with a discriminatory intent or purpose or with an intent to inhibit or punish the exercise of a constitutional right or with a malicious, bad-faith intent to injure the claimants. Although the trial justice found the school board less than consistent in defining and applying the residency ordinance, plaintiffs' failure of proof was fatal to their case. Judgment was entered on February 14, 2003, from which only Mr. Tassone appealed.[8]

## Standard of Review

■ When called upon to review the determination of a trial justice to grant or deny a permanent injunction, this Court will overturn the justice's findings of fact only when those findings are "clearly wrong" or when the justice has "overlooked or misconceived material evidence." *Retirement Board of the Employees' Retirement System of Providence v. City Council of Providence*, 660 A.2d 721, 724 (R.I.1995). Questions of law, however, are reviewed *de novo*. *Rhode Island Depositors Economic Protection Corp. v. Bowen Court Associates*, 763 A.2d 1005, 1007 (R.I. 2001).

5. We previously entertained an appeal concerning the school board's policy of enforcing § 1210 against regular and substitute teachers, but declined to reach the merits of the case because no actual controversy existed at the time of the appeal. *Providence Teachers Union v. Napolitano*, 690 A.2d 855, 856–57 (R.I.1997).

6. The defendants moved to deny plaintiffs' petition for a preliminary injunction, arguing that § 16–12–9 rendered the matter moot. The trial justice, however, denied defendants' motion and issued an order pursuant to Rule 65(a)(2) of the Superior Court Rules of Civil Procedure consolidating the hearing of plaintiffs' motion for a preliminary injunction with a hearing on the merits concerning the issuance of a permanent injunction for reinstatement.

7. Immediately following the trial justice's bench decision on July 25, 2002, defendants suggested that the court direct entry of final judgment on the issue of damages in accordance with Rule 54(b) of the Superior Court Rules of Civil Procedure. The court's decision about plaintiffs' equitable claims, defendants argued, precluded plaintiffs' claim for damages. The trial justice, however, reconfirmed that the court's decision on injunctive relief did not go to plaintiffs' request for monetary damages.

8. It should be noted, however, that the parties entered a stipulation in Superior Court on August 2, 2000, indicating that any judgment entered in the present case would be applied to all similarly situated teachers in the Providence School Department.

## Selective Enforcement

Mr. Tassone contends that the school board's nonrenewal of his teaching contract violates the equal protection guarantees found in both section 1 of the Fourteenth Amendment to the United States Constitution and article 1, section 2 of the Rhode Island Constitution. The plaintiff does not facially attack § 1210, but asserts that the school board's application of the residency requirement to only a few teachers amounted to selective enforcement of an otherwise lawful regulation. We disagree. For the following reasons, we reject plaintiff's selective enforcement argument pertaining to both the federal and Rhode Island equal protection clauses and affirm the decision of the Superior Court.

Selective enforcement is a subset of equal protection jurisprudence that this Court heretofore has not had an opportunity to address directly. *See, e.g.,* *State v. Partington,* 847 A.2d 272, 279–80 (R.I.2004) (declining to apply an equal-protection analysis because the issue of selective enforcement was not addressed by the motion justice below). Although not precisely on point, cases of selective prosecution in the criminal context provide a useful analogy. In *State v. Ricci,* 704 A.2d 210, 211 (R.I.1997), this Court adopted the analysis articulated by the United States Supreme Court in *Wayte v. United States,* 470 U.S. 598, 608 (1985), when reviewing an allegation of selective prosecution. *See also State v. Price,* 706 A.2d 929, 936 (R.I.1998) (applying *Wayte* in a later selective prosecution appeal). Writing for the Supreme Court in *Wayte,* Justice Powell required the petitioner to show not only that his prosecution was discriminatory in effect, but also that it was "motivated by a discriminatory purpose." *Wayte,* 470 U.S. at 608. This Court has given great weight to the latter element articulated in *Wayte,*

evinced from several of our selective prosecution cases which treat the failure to show discriminatory purpose as dispositive. *See, e.g., Price,* 706 A.2d at 936 (rejecting the defendant's selective prosecution claim because he was unable to demonstrate invidious discrimination); *State ex rel. Scott v. Berberian,* 109 R.I. 309, 314–15, 284 A.2d 590, 593–94 (1971) (same).

█ The deferential manner with which this Court traditionally reviews the decisions of prosecutors, however, limits the extent to which the selective prosecution analogy will pilot our analysis in the case at bar. In *Price,* we commented upon the uniformity with which we have recognized the "extreme deference due prosecutors in their prosecutorial decisions and the official discharge of their duties." *Price,* 706 A.2d at 936 (citing *United States v. Armstrong,* 517 U.S. 456, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996); *Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985)). Deference is due to prosecutors because of the prescribed discretion they possess to enforce the laws of the state, which calls for more than the rote indictment of every offense. *See Jefferson v. State,* 472 A.2d 1200, 1204 (R.I. 1984); *State v. Rollins,* 116 R.I. 528, 533, 359 A.2d 315, 318 (1976). A municipal administrator enforcing a municipal regulation, however, performs a function distinct from that of a prosecutor prosecuting under a criminal statute. *See State v. Russell,* 671 A.2d 1222, 1223 (R.I.1996) (holding that a municipal police officer did not possess the discretion to enter into a nonprosecution agreement with a criminal defendant absent consent from the Attorney General). This distinction requires us to look beyond the criminal context so we may more adequately address the issues in the present case.

■ We turn to the federal courts for guidance on this analogous species of equal-protection analysis. In a well-reasoned opinion, the United States Court of Appeals for the Second Circuit directly addressed selective enforcement in the context of state administrators in *LeClair v. Saunders*, 627 F.2d 606 (2d Cir.1980), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981). In *LeClair*, the plaintiff-dairy farmer argued that state inspectors had selectively enforced Massachusetts's required, though leniently imposed, annual sanitary inspections. *LeClair*, 627 F.2d at 607–08. State inspectors closed down the plaintiff's dairy production because the only source of water came from an unapproved well. *Id.* at 608. In rejecting the plaintiff's selective-enforcement argument, the Second Circuit employed a two-part test which a party asserting a deprivation of equal-protection rights must bear out. A selective-enforcement claimant must show: "(1) [he or she], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Id.* at 609–10. The plaintiff submitted evidence that ten or eleven other farms in the area displayed similar types of sanitary deficiencies, yet continued to produce and distribute dairy products. *Id.* at 610. The Second Circuit, however, found the evidence unpersuasive concerning whether the inspectors

purposefully and maliciously had violated the plaintiff's equal-protection rights, noting: "where no invidious discrimination or interference with the exercise of other express constitutional rights has occurred, the malice/bad faith standard should be scrupulously met." *Id.* at 610, 611. The plaintiff's failure to meet the second element, the Second Circuit concluded, rendered discussion of the first unnecessary. *Id.* at 610.

The United States Court of Appeals for the First Circuit applied the *LeClair* analysis to claims of selective enforcement in *Yerardi's Moody Street Restaurant & Lounge, Inc. v. Board of Selectmen of Randolph*, 932 F.2d 89, 92 (1st Cir.1991) (*Yerardi's III*), which addressed the actions of a municipal body.[9] In *Yerardi's III*, the plaintiff purchased an establishment that held a license allowing it to remain open and sell liquor until 2 a.m. *Id.* at 90. When the plaintiff petitioned the municipal board-defendant for a transfer of the license, the board granted the petition but imposed a 1 a.m. closing time. *Id.* At trial, the plaintiff produced evidence that of the fourteen licenses regulated by the defendant, only the plaintiff's license was "rolled back" to 1 a.m. *Id.* at 92. Unpersuaded by this evidence, the First Circuit held:

"[D]ifferent treatment does not itself prove bad faith intent to injure. * * * If that were the case, [*LeClair's*] two-prong test would collapse on itself, allowing a finding that equal protection

---

9. The First Circuit first adopted the *LeClair* analysis in *Yerardi's Moody Street Restaurant & Lounge, Inc. v. Board of Selectmen of Randolph*, 878 F.2d 16, 21 (1st Cir.1989) (*Yerardi's II*), but did not apply the analysis meticulously until the appeal after remand in *Yerardi's III*. Yerardi's had initially sought redress in the state courts of Massachusetts, giving rise to *Yerardi's Moody Street Restau-*

*rant & Lounge, Inc. v. Board of Selectmen of Randolph*, 19 Mass.App.Ct. 296, 473 N.E.2d 1154 (*Yerardi's I*), *further rev. denied*, 394 Mass. 1103, 477 N.E.2d 595 (1985). *See Yerardi's Moody Street Restaurant & Lounge, Inc. v. Board of Selectmen of Randolph*, 932 F.2d 89, 90 (1st Cir.1991) (providing the procedural background of the case).

rights were violated simply by the showing of different treatment." *Id.*

"[W]e must insist on more than the gossamer proofs offered here before a jury will be entitled to find a bad faith intent to injure in violation of the equal protection clause." *Id.* at 94.

The First Circuit thus affirmed the district court's decision granting the defendant's motion for a directed verdict. *Id.; see also Rubinovitz v. Rogato,* 60 F.3d 906, 909–10 (1st Cir.1995) (applying *LeClair* to claims that a zoning board had selectively enforced building code provisions).

■ In the present case, plaintiff specifically acknowledges that this two-prong analysis, as set forth in *Yerardi's III,* is the appropriate selective-enforcement standard. Indeed, he asserts that the trial justice "erred in holding that the discharge of only five individuals, including Tassone, did not amount to treatment that was the product of intentional or purposeful discrimination based upon impermissible considerations." We conclude, however, that plaintiff's evidence neither establishes discriminatory animus, nor does it provide adequate inferences of any impermissible consideration.

The plaintiff points to Providence School Board Resolution No. 2650, dated February 23, 1998, which authorized the nonrenewal of forty-five regular teachers for failure to meet the residency requirement of § 1210. The school board, however, later rescinded the nonrenewals of nearly forty such teachers. The plaintiff argues that the school board's large-scale rescission in 1998, followed by a lack of rescission of plaintiff's nonrenewal in 1999, shows that the school board maliciously enforced § 1210 against plaintiff. The defendants respond that the school board rescinded the nonrenewals of the nearly forty people because each teacher had thereafter established compliance with § 1210 by proving residency in Providence. Partially responsible, a computer program had mistakenly treated post-office box addresses as indicia of nonresidency.

The plaintiff also contends it was discriminatory for the school board to allow five regular teachers to retain their teaching positions despite relocating to areas outside of Providence in the mid—to late 1990s. The school board hired all five as regular teachers after January 1, 1993, which, under normal circumstances, would have brought them under the regulatory ambit of § 1210's residency requirement. Superintendent DeRobbio explained, however, that the five itinerant teachers had substituted in the Providence school system before the effective date of § 1210. As such, school administrators conferred grandfather status upon these teachers in accordance with the school board's unwritten policy. That policy, as human resource administrator Sharen Gleckman discussed, was to grandfather all those teachers who would normally be subject to the residency requirement upon being hired as a regular teacher, but had worked in the Providence school system before January 1, 1993 as substitutes. Although not all substitutes would become regular teachers, Ms. Gleckman explained that the few that the school board did elevate to the status of regular teacher would benefit by not having to comply with § 1210's residency requirement.

The plaintiff further insists that four nonresident regular teachers, Ryan Cafferty, Donald Centracchio, Erin Moran, and Amy Wood, without grandfather status, nonetheless continued to teach in Providence at the time of trial. Ms. Gleckman testified that Mr. Cafferty started as a long-term substitute on May 8, 1996, and as a regular teacher on December 16, 1996. The school board hired Mr. Cent-

racchio as a long-term substitute on October 24, 1995, and later as a regular teacher on September 8, 1997. Ms. Moran became a regular teacher on August 24, 1998, without any substituting experience in Providence. Finally, Ms. Wood began her teaching career as a long-term substitute on October 28, 1997, and as a regular teacher on January 26, 1998. The plaintiff emphasizes Ms. Gleckman's inability to provide a reason why these four teachers, without any apparent exemption from § 1210, continued to teach in Providence. At trial, defendants ceded that Mr. Cafferty, Mr. Centracchio, Ms. Moran, and Ms. Wood may have simply "[fallen] through the cracks." Indeed, the trial justice found that defendants were "sometimes less than consistent in defining and applying its residency ordinance and that some individuals similarly situated and within the same job classifications were treated differently." However, of all the teachers relevant to this appeal, only these four teachers lacked both grandfather status and residency documentation of one sort or another.

■ We are satisfied that the evidence in this case cannot support a finding that defendants selectively enforced § 1210 against plaintiff in violation of section 1 of the Fourteenth Amendment to the United States Constitution or article 1, section 2, of the Rhode Island Constitution. In reaching this decision, we note that plaintiff's equal-protection claim fails independently under both constitutional provisions. We borrow a standard articulated and applied in related federal appellate cases to analyze plaintiff's claim under our state constitution because the federal courts have had occasion to address selective-enforcement claims directly. The

equal-protection guarantees secured by the Fourteenth Amendment, however, in no way limit those protections Rhode Island citizens possess by nature of article 1, section 2. In adding an equal-protection clause to the Rhode Island Constitution in 1986, the drafters commented that the inclusion would create an independent state foundation for individual rights. State of Rhode Island in Constitutional Convention, *Report of the Citizens Rights Committee on Individual Rights,* Res. 86–00032, Jan. Sess., at 6 (1986) (unpublished). The drafters' rationale for adding a parallel yet independent equal-protection clause was presumably to protect the citizens of this state should the federal judiciary adopt a more narrow interpretation of the Fourteenth Amendment. *Report of the Citizens Rights Committee,* at 6. We remain mindful of the autonomous character of our equal-protection clause, and therefore rest our decision on both grounds.

■ In the case before us, the school board terminated the plaintiff's employment, as required by § 1210 at the time, because he did not establish Providence residency within six months from the date of his elevation to regular teacher and did not otherwise qualify under the grandfather policy as applied by the school board. The school administrators' incapacity to maintain current and complete employee files may be unsettling. Nonetheless, the plaintiff failed to show any malicious or bad-faith intent by the defendants to injure the plaintiff by not renewing his teaching contract in accordance with what was, at the time, a lawful residency provision. We agree, therefore, with the trial justice that this failure of proof was fatal to the plaintiff's claim.[10]

---

**10.** In light of our holding that the plaintiff failed to show that he was selectively treated based upon impermissible considerations, we need not address the plaintiff's first claim of error, *viz.,* that the trial justice erred by ruling that it was necessary for the plaintiff to prove

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court, to which we remand the record in this case.

membership in a "class" or some "common thread" that bound him together with the other four teacher-plaintiffs. Although we believe that the plaintiff may have misconstrued the trial justice's pronouncement in this regard, it is our understanding that, at least under federal law, an equal-protection claim may be advanced by an individual as a "class of one." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000); *Donovan v. City of Haverhill*, 311 F.3d 74, 77 (1st Cir.2002).